[ORAL ARGUMENT NOT YET SCHEDULED]

## No. 23-5025

## In The United States Court of Appeals
## For The District of Columbia Circuit

AFGHAN AND IRAQI ALLIES UNDER SERIOUS THREAT BECAUSE OF
THEIR FAITHFUL SERVICE TO THE UNITED STATES, *On Their Own and
On Behalf of Others Similarly Situated*,

*Plaintiffs-Appellees*,

v.

ANTONY J. BLINKEN, in his official capacity as
Secretary of the United States Department of State, *et al.*,

*Defendants-Appellants*.

On Appeal from the United States District Court for the District of Columbia
No. 1:18-cv-1388 (Hon. Tanya S. Chutkan)

## BRIEF FOR APPELLANTS

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney
  General*

WILLIAM C. PEACHEY
  *Director*

YAMILETH G. DAVILA
  *Assistant Director*

STEVEN A. PLATT
  *Senior Litigation Counsel*

RUTH ANN MUELLER
  *Trial Attorney*
  *District Court Section*
  *Office of Immigration Litigation*
  *U.S. Department of Justice*
  *P.O. Box 868, Ben Franklin Station*
  *Washington, DC 20044*
  *(202) 598-2445*
  *ruth.a.mueller@usdoj.gov*

SEAN L. KING
DAVID J. BYERLEY
  *Trial Attorneys*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rules 12(c) and 28(a)(1), Defendants-Appellants certify as follows:

**A.    Parties and Amici:** The following lists all the parties who appeared before the district court and will appear before this Court.

- Plaintiffs-Appellees: Afghan and Iraqi Allies Under Serious Threat Because of Their Faithful Service to the United States, John Doe Alpha, Jane Doe Bravo, John Doe Charlie, John Doe Delta, and John Doe Echo, on their own and on behalf of others similarly situated.

- Defendants-Appellants: U.S. Department of State, U.S. Department of Homeland Security, Antony Blinken, in his official capacity, Alejandro N. Mayorkas, in his official capacity, Connie Nolan, in her official capacity, Ur N. Jaddou, in her official capacity, and Rena Bitter, in her official capacity.

- Amici: There are no amici curiae on appeal currently. Ambassador Ryan Crocker, the Afghan-American Foundation, Association of Wartime Allies, and Veterans for American Ideals all appeared as amici curiae in the district court.

**B.    Rulings Under Review:** Defendants-Appellants appeal the district court's Memorandum Opinion of November 30, 2022, Order of November 30, 2022, and Minute Order of Referral to Magistrate Judge of December 1, 2022.

**C.    Related Cases.** This case was previously before the Court on a notice of appeal filed by Defendants-Appellants on August 12, 2020. *See* Case No. 20-5251. The Court dismissed that appeal on September 16, 2021, upon Defendants' unopposed motion for voluntary dismissal.

Plaintiffs-Appellees also filed a notice of appeal on June 22, 2022. *See* Case No. 22-5183. The Court dismissed that appeal on November 10, 2022, for lack of jurisdiction.

Counsel for Defendants-Appellants are not aware of any related cases within the meaning of Circuit Rule 28(a)(1)(C).

/s/ *Ruth Ann Mueller*
RUTH ANN MUELLER
*Trial Attorney*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................v

GLOSSARY OF ABBREVIATIONS ................................................................x

INTRODUCTION................................................................................................1

STATEMENT OF JURISDICTION, TIMELINESS, AND VENUE.................4

STATEMENT OF THE ISSUES........................................................................4

PERTINENT STATUTES AND POLICIES .....................................................4

STATEMENT OF THE CASE............................................................................5

   I.   STATUTORY FRAMEWORK.................................................................5

      A.  Overview of the Iraqi and Afghan SIV Program........................5

      B.  Congressional Oversight of the SIV Program.............................7

   II.  FACTUAL BACKGROUND..................................................................9

      A.  Commencement of Litigation.......................................................9

      B.  Order Adopting an Adjudication Plan........................................10

      C.  Proceedings After Entry of the Approved Adjudication Plan.............11

      D.  District Court Decision on Appeal..............................................14

SUMMARY OF THE ARGUMENT ................................................................18

STANDARD OF REVIEW ..............................................................................20

ARGUMENT.....................................................................................................21

   I.   THE DISTRICT COURT FAILED TO PROPERLY EVALUATE THE *TRAC* FACTORS UNDER RULE 54(b) ......................................................21

      A.  Legal Standard Under Rule 54(b) .............................................21

---

\* Authorities chiefly relied upon are marked with an asterisk.

B. Agencies Are Reasonably Processing SIV Applications Under a New Regime of Streamlining Measures, Restructuring, and Other Process Improvements Since 2019 Under *TRAC* Factors 1 and 2............................22

C.  Factors 3 and 5 Favor the Agencies Because the SIV Program Implicates Foreign Affairs, Immigration, and National Security Decision-Making............................................................................................................36

D.  *TRAC* Factor 4 Favors the Agencies Because the Need to Review and Rigorously Screen Application Materials Vies for  Limited Agency Resources.........................................................................................................45

E.  *TRAC* Factor 6 Favors the Agencies Because They Have Acted in Good Faith ..........................................................................................49

II.  THE DISTRICT COURT ABUSED ITS DISCRETION BY DECLINING TO TERMINATE THE INJUNCTION UNDER RULE 60(b) ............................................................................................................50

A.  Termination Under Rule 60(b)(5) Is Appropriate Because Prompt Return of the SIV Program to the Political Branches Is Required in Institutional Reform Litigation.................................................................52

B.  Termination Under Rule 60(b)(6) Is Appropriate Because Compliance with the Injunction Is No Longer Practicable...............................55

CONCLUSION ....................................................................................57

CERTIFICATE OF COMPLIANCE ...................................................58

CERTIFICATE OF SERVICE .............................................................59

ADDENDUM......................................................................................A1

_____

\* Authorities chiefly relied upon are marked with an asterisk.

iv

# TABLE OF AUTHORITIES

## Cases

*Ackermann v. United States*, 340 U.S. 193 (1950) .................................................51

*Action on Smoking & Health v. Dep't of Labor*, 100 F.3d 991 (D.C. Cir. 1996)....44

*Air Line Pilots Ass'n, Int'l v. Civil Aeronautics Bd.*, 750 F.2d 81 (D.C. Cir. 1984) ................................................................................................................22

*\*Am. Council of the Blind v. Mnuchin*, 878 F.3d 360 (D.C. Cir. 2017)............53, 54

*Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183 (D.C. Cir. 2016)...................................50

*Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977).....................54

*Capitol Sprinkler Inspection, Inc. v. Guest Services, Inc.*, 630 F.3d 217 (D.C. Cir. 2011) .......................................................................................................21

*\*Ctr. for Sci. in the Pub. Int. v. U.S. Food & Drug Admin.*, 74 F. Supp. 3d 295 (D.D.C. 2014).....................................................................................37, 48, 49

*Cobell v. Jewell*, 802 F.3d 12 (D.C. Cir. 2015) ..................................................20, 21

*Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir. 2001) .................................................20

*Council of & for the Blind of Del. Cnty. Valley, Inc. v. Regan*, 709 F.2d 1521 (D.C. Cir. 1983) ......................................................................................................40

*Cutler v. Hayes*, 818 F. 2d 879 (D.C. Cir. 1987)..............................................24, 44

*El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836 (D.C. Cir. 2010).........40

*EMR Network v. FCC*, 391 F.3d 269 (D.C. Cir. 2004) ..........................................46

*Good Luck Nursing Home, Inc. v. Harris*, 636 F.2d 572 (D.C. Cir. 1980).............56

*Grand Canyon Air Tour Coalition v. FAA*, 154 F.3d 455 (D.C. Cir. 1998) ................................................................................................................28, 38

*Harisiades v. Shaughnessy*, 342 U.S. 580 (1952)..............................................38, 54

---

\* Authorities chiefly relied upon are marked with an asterisk.

*Herron v. Fannie Mae*, Case No. 10-943, 2012 WL 13042852 (D.C. Cir. Mar. 28, 2012) ...................................................................................................26

*\*Horne v. Flores*, 557 U.S. 433 (2009) .......................................20, 51, 53

*In re Aiken Cnty.*, 725 F.3d 255 (D.C. Cir. 2013)...................................28

*In re Am. Fed'n of Gov't Emps.*, 837 F.2d 503 (D.C. Cir. 1988).....................24, 50

*In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413 (D.C. Cir. 2004)..............28

*\*In re Barr Labs., Inc.*, 930 F.2d 72 (D.C. Cir. 1991)............. 28, 31, 33, 38, 46, 48

*In re Pub. Emps. For Env't Resp.*, 957 F.3d 267 (D.C. Cir. 2020) ..................15, 28

*Jolly v. Listerman*, 672 F.2d 935 (D.C. Cir. 1982) ..................................23

*Khan v. Blinken*, No. 21-cv-1683 (JEB), 2021 WL 5356267 (D.D.C. Nov. 17, 2021) ...................................................................................................35

*Kleindienst v. Mandel*, 408 U.S. 753 (1972) ..........................................30

*Liberty Fund, Inc. v. Chao*, 394 F. Supp. 2d 105 (D.D.C. 2005) ..........................50

*Lin v. D.C.*, 47 F.4th 828 (D.C. Cir. 2022) ............................................41

*\*Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094 (D.C. Cir. 2003) ................................................................ 28, 32, 33, 35, 39, 45

*Mathews v. Diaz*, 426 U.S. 67 (1976).....................................................38

*Mobarez v. Kelly*, 187 F. Supp. 3d 85 (D.D.C. 2016) ..............................40

*Muwekma Tribe v. Babbitt*, 133 F. Supp. 2d 30 (D.D.C. 2000)..............................46

*Nine Iraqi Allies Under Serious Threat Because of Their Faithful Serv. to the United States v. Kerry*, 168 F. Supp. 3d 268 (D.D.C. 2016) .............................39, 45

*Norton v. S. Utah Wilderness All., 542 U.S. 55 (2004)* ...........................41

*OPM v. Richmond*, 496 U.S. 414 (1990)....................................................38

*Petties ex rel. Martin v. D.C.*, 662 F.3d 564 (D.C. Cir. 2011) ................................52

*Potomac Elec. Power Co. v. ICC*, 702 F.2d 1026 (D.C. Cir. 1983).......................29

---

\* Authorities chiefly relied upon are marked with an asterisk.

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) ..................36

*Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367 (1992).......................13, 51, 54

*Saavedra Bruno v. Albright*, 197 F.3d 1153 (D.C. Cir. 1999) ................................30

*Shatsky v. Palestine Liberation Org.*, 955 F.3d 1016 (D.C. Cir. 2020) .................21

*Sierra Club v. Thomas*, 828 F.2d 783 (D.C. Cir. 1987)............................40, 42, 48

*Skalka v. Kelly*, 246 F. Supp. 3d 147 (D.D.C. 2017)........................................30, 39

*Smalls v. United States*, 471 F.3d 186 (D.C. Cir. 2006).........................................21

*Telecomm. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) 1, 29, 45, 50

*United States v. Maria*, 186 F.3d 65 (2d Cir. 1999) ................................................23

*United States v. Trabelsi*, 28 F.4th 1291 (D.C. Cir. 2022) ....................................20

*United States v. W. Elec. Co.*, 46 F.3d 1198 (D.C. Cir. 1995) ...............................52

*Wang v. Blinken*, 3 F.4th 479 (D.C. Cir. 2021) ......................................................24

*Wayte v. United States*, 470 U.S. 598 (1985) .........................................................30

## Federal Statutes

8 U.S.C. § 1101(a)(3)....................................................................................................5

8 U.S.C. § 1101(a)(16)..................................................................................................5

8 U.S.C. § 1101(a)(27)..................................................................................................5

8 U.S.C. § 1105(a) ......................................................................................................31

8 U.S.C. § 1151(a)-(b) .................................................................................................5

8 U.S.C. § 1153(b)(4)...................................................................................................5

8 U.S.C. § 1153(f)........................................................................................................31

8 U.S.C. § 1181(a)(1)....................................................................................................5

8 U.S.C. § 1201(a)(1)(A) ..............................................................................................5

8 U.S.C. § 1202(b), (e).................................................................................................31

8 U.S.C. § 1204 .......................................................................................................5, 31

_____

* Authorities chiefly relied upon are marked with an asterisk.

28 U.S.C. § 1292(a)(1)................................................................4

## Federal Rules or Regulations

Fed. R. Civ. P. 54(b) ...............................................................21

Fed. R. Civ. P. 60(b)(6)...........................................................51

Fed. R. Evid. 201(d)................................................................26

## Public Law

*Afghan Allies Protection Act (AAPA), Pub. L. No. 111-8, 123 Stat. 807 (2009), *codified as amended in* 8 U.S.C. § 1101 note.......................................6, 7, 8, 31, 38

Consolidated Appropriations Act 2019, Pub. L. No. 116-6, § 7076, 113 Stat. 13...9,

*Emergency Security Supplemental Appropriations Act, 2021 (ESSAA), Pub. L. No. 117-31, § 401(a)(3), tit. IV, 135 Stat 309 ...............................................8, 23, 40

National Defense Authorization Act, Pub. L. No. 113-291, § 1227 (2014); Pub. L. No. 114-92, § 1216(a)(2) (2015)................................................................8

*Refugee Crisis in Iraq Act (RCIA), Pub. L. No. 110-181, 122 Stat. 395 (2008), *codified as amended in* 8 U.S.C. § 1157 note.......................................6, 7, 8, 31, 38

## Other

*Report of the Iraqi SIV Program – January 2023*, https://travel.state.gov/content/dam/visas/SIVs/Iraqi-Public-Quarterly-Report-Q1-Jan-2023.pdf................................................................26

U.S. Dep't of State, *Foreign Affairs Manual*, 9 FAM 502.5-12(B)(b)(9)...........9, 49

---

\* Authorities chiefly relied upon are marked with an asterisk.

U.S. Dep't of State, *Report of the Afghan SIV Program – January 2023*,
https://travel.state.gov/content/dam/visas/SIVs/Afghan-Public-Quarterly-Report-
Q1-Jan-2023.pdf .......................................................................................................26

---

\* Authorities chiefly relied upon are marked with an asterisk.

# GLOSSARY OF ABBREVIATIONS

AAPA        Afghan Allies Protection Act of 2009

ECF         District Court Docket Citation, followed by page number

JA          Joint Appendix, followed by page number

COM         Chief of Mission

ESSAA       Emergency Security Supplemental Appropriations Act, 2021

RCIA        Refugee Crisis in Iraq Act of 2007

SIV         Afghan and Iraqi Special Immigrant Visa

*TRAC*        *Telecomm. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984)

USCIS       U.S. Citizenship and Immigration Services

**INTRODUCTION**

Congress established the Special Immigrant Visa (SIV) program to resettle Iraqis and Afghans who experienced an ongoing and serious threat because of their assistance to the U.S. Government or the International Security Assistance Force during U.S. military operations in Iraq and Afghanistan. Through the Refugee Crisis in Iraq Act of 2007 (RCIA) and the 2009 Afghan Allies Protection Act (AAPA) (collectively, Acts), applicants undergo a multiple-step application process, which requires, among other things, a review of the applicant's assistance to the U.S. government by the relevant Chief of Mission (COM) and intensive background screening. Recognizing the inherent challenges of administering the SIV program, Congress did not mandate an adjudication deadline. Rather, Congress provided that Appellants the U.S. Department of State and U.S. Citizenship and Immigration Services (USCIS) (collectively, Agencies) "should" complete all steps under government control within 9 months.

In 2019, the district court concluded that the Agencies were unreasonably delaying the adjudication of SIV applications under the test of *Telecommunications Research and Action Center v. FCC* (*TRAC*), 750 F.2d 70 (D.C. Cir. 1984), and adopted an adjudication plan to provide for timelines and reporting on steps in the SIV process for the Appellees-class members (Allies). But since that time—as the district court recognized—the Agencies have faced enormous challenges not of their

1

own making in adjudicating SIV applications, including an enormous upsurge in the number of applications following the suspension of operations at Embassy Kabul after the Taliban takeover of Afghanistan in 2021, which renders in-person interviews in Afghanistan impossible; a security situation in Baghdad that rendered in-person interviews there impossible for months; and the suspension of consular assistance worldwide during the COVID-19 pandemic. The district court also acknowledged that the Agencies had made significant strides towards streamlining the application process and adding resources, yielding a substantial decline in processing time and an increase in the throughput of applications at all stages. While the district court recognized that its initial injunction should be modified due to changed circumstances, it nonetheless concluded that the Agencies were still unreasonably delaying adjudication of SIV applications and ordered the parties to propose new plans to govern those adjudications.

That conclusion was error. Under a proper application of the *TRAC* Factors, the Agencies are not engaging in unreasonable delay, and the Agencies should have been granted relief from the injunction, under either Rule 54(b) or Rule 60(b). In part, the district court's analysis rests on an erroneous elevation of Congress's nine-month adjudication benchmark to near-mandatory status. But the court's errors are broader, for it failed to properly weigh either the Agencies' significant improvements in adjudication or the Agencies' challenges in confronting the flood

of new applications with consular posts closed worldwide because of the pandemic and in both Iraq and Afghanistan because of security challenges. And the court failed to give proper weight to the Executive Branch's authority and need to manage its own resources to respond to rapidly changing international crises. In sum, the Agencies presented a host of changed circumstances in support of their motion for relief that upended the district court's 2019 unreasonable delay analysis. This Court should reverse the unreasonable delay determination and return adjudication of SIV applications to the responsibility of the Agencies, subject to the direction of the Executive Branch and their substantial reporting obligations to Congress, which has taken a consistent and intensive interest in the SIV program.

Further, the district court abused its discretion in failing to grapple with the Agencies' Rule 60(b) arguments that the adjudication plan injunction should be set aside on the basis that it was no longer equitable, in the public interest, or practicable. The district court disregarded Supreme Court precedent articulating the need for a flexible injunctive relief standard in institutional reform litigation. The district court abused its discretion by failing to consider termination of the injunction given significant changed circumstances that rendered judicial intervention inconsistent with the Executive's need and ability to manage policy initiatives in the complex area of immigration benefits, national security, and foreign affairs.

## STATEMENT OF JURISDICTION, TIMELINESS, AND VENUE

The jurisdiction of the district court was invoked under 28 U.S.C. § 1331. After earlier entering a permanent injunction in the Allies' favor as to Counts 1 and 2 of the amended complaint, the district court issued an order on November 30, 2022, refusing to terminate the injunction. Joint Appendix (JA) 989–1002. The district court also referred the matter to a magistrate judge to oversee discovery. JA1003. The government filed a timely notice of appeal on January 30, 2023. JA1005.

This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1.    Whether the district court erred by denying the Agencies' motion to terminate the injunction under Rule 54(b), holding that the Agencies violated the Administrative Procedure Act by unreasonably delaying the adjudication of class members' SIV applications, and ordering further proceedings, where there is no applicable statutory deadline and processing times have markedly improved.

2.    Whether the district court erred by failing to terminate the injunction pursuant to Federal Rule of Civil Procedure 60(b), because a judicially managed SIV adjudication plan is no longer in the public interest, equitable, or practicable given the engagement of the political branches and the changed factual landscape.

## PERTINENT STATUTES AND POLICIES

Pertinent statutes and policies are reproduced in the addendum to this brief.

4

## STATEMENT OF THE CASE

## I.     STATUTORY FRAMEWORK

### A.     Overview of the Iraqi and Afghan SIV Program

To be admitted to the United States and reside permanently, a noncitizen[1]
needs a statutorily provided basis, such as an immigrant visa. *See* 8 U.S.C.
§ 1181(a)(1). To receive an immigrant visa, the noncitizen must demonstrate that
they fall within one of a limited number of immigration categories. *See, e.g.*, *id.*
§ 1151(a)–(b). A person in a qualifying category may then apply for an immigrant
visa, permitting them to seek lawful permanent residence upon entry into the United
States. *Id.* §§ 1101(a)(16), 1201(a)(1)(A), 1204.

The most common qualifying categories include family-sponsored and
employment-based noncitizens. At issue in this case is the category of "qualified
special immigrants." *Id.* § 1153(b)(4); *see id.* §§ 1151(a)(2), 1101(a)(27). Qualified
special immigrants include certain employees of the U.S. government or others who
benefited or served the U.S. government abroad. *See, e.g.*, *id.* § 1101(a)(27)(D), (G).
Starting in 2007, Congress temporarily broadened the special immigrant category to
include Iraqi and Afghan nationals who have "provided faithful and valuable
service" to the U.S. government in their home countries and who have experienced

---

[1] This brief uses the term "noncitizen" as equivalent to the statutory term
"alien." *See* 8 U.S.C. § 1101(a)(3).

a "serious threat as a consequence" of their employment. RCIA, Pub. L. No. 110-181, § 1244, 122 Stat. 395 (2008), *codified as amended in* 8 U.S.C. § 1157 note; AAPA, Pub. L. No. 111-8, § 602, 123 Stat. 807 (2009), *codified as amended in* 8 U.S.C. § 1101 note.

Between the requirements that apply to all visa applicants and the program-specific criteria established by the RCIA and AAPA, Iraqi and Afghan nationals previously had to complete fourteen steps to qualify for an SIV under those Acts. *See* JA62–76. These steps required the noncitizen to submit, and have approved, three separate applications, in sequence: (1) an application for COM approval sent to the State Department; (2) a Form I-360 Petition sent to USCIS; and (3) a visa application sent to the State Department. *See id.* The COM approval phase requires submission of documents to prove initial SIV eligibility. *See id.* Once an applicant submitted an I-360 petition to USCIS, USCIS would either approve or issue a Request for Evidence or Notice of Intent to Deny to the applicant. *See id.* The visa application step requires additional document submissions and scheduling of an interview. *See id.* Congress has also required the Agencies to subject each applicant to intensive background checks and screening. *See* RCIA § 1244(a)(4); AAPA § 602(b)(1)(D) (requiring that each applicant "clear[] a background check and appropriate screening, as determined by the Secretary of Homeland Security").

Neither the RCIA nor the AAPA contains a mandatory adjudication deadline by which all steps (or any particular step) must be completed. *See generally* the Acts.

### B.    Congressional Oversight of the SIV Program

The SIV program has several aspects, which Congress has continually monitored and changed. *First*, Congress has expressed its preference for expeditious and streamlined treatment of SIV applications, but it has never imposed a mandatory deadline on agency adjudications. In 2013, Congress amended the Acts to provide that the government "shall improve the efficiency" for SIV processing such that "all steps under the control of the respective departments incidental to the issuance of such visas, including required screenings and background checks, *should* be completed not later than 9 months after the date on which an eligible alien submits all required materials to complete an application for such visa." RCIA § 1242(c)(1); AAPA § 602(b)(4)(A) (2013) (emphasis added). However, Congress stressed that "*nothing*" in that provision "limit[s] the ability of a Secretary . . . to take longer than 9 months to complete those steps . . . in high-risk cases for which satisfaction of national security concerns requires additional time." RCIA § 1242(c)(2); AAPA § 602(b)(4)(B) (emphasis added). In July 2021, Congress again emphasized that "all steps, including Chief of Mission approval, under the control of the respective departments incidental to the issuance of [SIVs] . . . *should* be completed not later than 9 months" after the applicant has submitted all required materials to complete

7

an application for an SIV. Emergency Security Supplemental Appropriations Act, 2021 (ESSAA), Pub. L. No. 117-31, § 401(a)(3), tit. IV, 135 Stat 309 (emphasis added).

*Second*, Congress has repeatedly expanded program eligibility since the program's inception, which has substantially increased the numbers of applications that the Agencies must review and adjudicate. For example, Congress expanded AAPA qualifying employment in 2014 to include the International Security Assistance Force and again in 2015 to include any successor missions. National Defense Authorization Act, Pub. L. No. 113-291, § 1227 (2014); Pub. L. No. 114-92, § 1216(a)(2) (2015). Congress in 2021 modified certain employment criteria, broadening SIV eligibility. In particular, Congress reduced the period of qualifying employment from two years to one year and removed the previous requirement that those applicants have performed "sensitive and trusted" activities. ESSAA § 401(a).

*Third*, Congress from the outset has monitored the program by requiring the Agencies to submit various reports. These include quarterly reports that describe efficiency improvements as well as processing numbers and average wait times at each application stage. *See* AAPA § 602(b)(12); RCIA § 1248(g). Congress also required a new comprehensive report on the SIV program to be delivered in July 2022. ESSAA § 401(c).

8

*Fourth*, in 2019, Congress required the State Department to develop and implement a prioritization plan for Afghan SIV applicants. Consolidated Appropriations Act 2019, Pub. L. No. 116-6, § 7076, 113 Stat. 13. The Secretary of State developed a programmatic change in processing applicants under the AAPA. U.S. Dep't of State, *Foreign Affairs Manual*, 9 FAM 502.5-12(B)(b)(9). That plan prioritized Afghan nationals seeking SIVs under the AAPA in order as follows: (1) interpreters and translators; (2) U.S. government direct hire employees; (3) contractors with U.S. government installation badges; (4) implementing partners; and (5) all other applicants. *Id.*

## II.    FACTUAL BACKGROUND

### A.    Commencement of Litigation

The Allies filed their five-count class complaint in June 2018. ECF No. 1. In Count 1, the Allies seek a declaration that the government has a non-discretionary duty to adjudicate their SIV applications within nine months, and that the government has not fulfilled that duty. Am. Compl. ¶¶ 68–71, ECF No. 23. In Count 2, the Allies allege unreasonable delay under the Administrative Procedure Act, seeking an order "compelling [the government] to adjudicate their SIV applications." *Id.* ¶¶ 72–77. Count 3 seeks a writ of mandamus to adjudicate SIV applications, and Counts 4 and 5 challenge the government's appointment of SIV

coordinator positions created by the Acts. *Id.* ¶¶ 78–92. (Counts 3 through 5 are not at issue in this appeal.)

The Allies filed a motion for a preliminary injunction, which the district court consolidated with the trial on the merits under Federal Rule of Civil Procedure 65(a)(2). Hr'g Tr. 8:7–13, ECF No. 72. On September 20, 2019, the court granted judgment to the Allies on Counts 1 and 2. JA1–21. The court applied the *TRAC* Factors and declared the delays in processing and adjudicating SIV applications unreasonable. JA9 (citing *TRAC*, 750 F.2d 70). In particular, the court found that class members, on average, waited two and a half years for a decision on their COM applications, and an additional three years for final adjudication, for a five-year average wait time. JA9–10. The court concluded that the delays warranted relief. JA 13, 17.

## B.     Order Adopting An Adjudication Plan

Upon order of the court, on May 21, 2020, the parties jointly proposed an adjudication plan. ECF Nos. 106, 111. The court "approve[d] and adopt[ed]" the adjudication plan, JA62, which the parties agreed would be an injunction, ECF No. 112. This Approved Adjudication Plan establishes specific time windows for the government to complete the fourteen-step SIV process, although it recognizes that some cases may "require additional processing time to reconcile any national security concerns," which will be reported to the court. JA69. The Plan calls for the

10

government to provide progress reports every 90 days, and to explain steps taken to remedy progress shortfalls. JA70–71. The Agencies must submit data on, *inter alia*, the number of class members who began, ended, and completed the reporting period at each government step. JA72. The Plan also permits the Allies to challenge the Agencies' explanations for not meeting the Plan's benchmarks, including with meet and confers and the possibility of going to the court. JA71.

### C.    Proceedings After Entry of the Approved Adjudication Plan

The government submitted quarterly progress reports under the Plan. ECF Nos. 120, 133, 137–38. The reports acknowledged failures to certain timing benchmarks, and the Allies identified certain errors for correction. ECF Nos. 121, 141, 142, 149. Following passage of the ESSAA, the onset of the COVID-19 pandemic, the Taliban takeover of Afghanistan in August 2021 resulting in a huge upsurge in the number of SIV applications, a security crisis affecting the U.S. Embassy in Baghdad, and several administrative reforms spurred by executive orders, the parties pursued settlement discussions and stipulated to stay proceedings and the Plan as of October 19, 2021. *See* ECF No. 144; *see also* ECF No. 147. The district court granted the stay and, in March 2022, extended the stay "until further order of the court." JA1039.

Once settlement negotiations proved unsuccessful, on May 24, 2022, the Agencies moved under Federal Rules of Civil Procedure 54(b) and 60(b)(5)–(6) for

11

relief from the court's unreasonable-delay judgment and the Approved Adjudication Plan, seeking termination or modification of the Plan. *See* JA77.[2] First, the Agencies argued that the injunction should be terminated under Rule 54(b) following global events and administrative changes favoring the Agencies under a revised *TRAC* analysis. Specifically, the Agencies explained how the SIV program was affected by global events, including the U.S. withdrawal from Afghanistan in 2021, a suspension of operations at U.S. Embassy Kabul, an unprecedented influx of inquiries and submissions as a result of the Afghan humanitarian crisis following Taliban takeover of Afghanistan, the lingering COVID-19 restrictions by countries hosting U.S. consulates and embassies, and continued security concerns in Iraq. *See* JA99–101, 103–05. In support of relief, the Agencies detailed numerous streamlining and program improvements including surged staffing, technological updates to manage workflow, elimination and consolidation of portions of the once fourteen-step application process, and restructured COM processing to reduce the burden on the

---

[2] The Allies contended that Rule 54(b) was inapplicable to the 2019 *TRAC* order and that Rule 60(b) applied. JA238–39. But the Agencies' motion separately sought revision of the 2019 *TRAC* analysis under Rule 54(b) because that order was not a final resolution of all claims in the case. In the alternative, if the 2019 merits decision were a final judgment, the Agencies argued that Rule 60(b) provided relief from an outdated injunction where judicial supervision intrudes upon the Executive's decision-making and is no longer in the public interest. *See, e.g.*, JA96, 123. The Agencies' motion sought relief under both standards in the alternative.

applicants—all while under oversight from the political branches including the congressional reports. *See* JA101–02, 108–10.

The fruits of these improvements were reflected in objective data submitted to the district court. At the COM phase alone, the review process increased from 997 and 1,841 COM decisions in quarters two and three of fiscal year 2020, respectively, to 6,307 decisions in the first quarter of fiscal year 2022. JA102. At the same time, the Agencies reduced *total* average processing times for all steps of the Afghan SIV program to 734 and 587 days across quarters one and two of fiscal year 2022, respectively, and to 440 days for the Iraqi program in the first quarter of fiscal year 2022, as compared to the two-and-a-half to five-year average wait time for COM decisions *alone* that the district court found in 2019. JA102–03.

Next, the Agencies sought termination of the injunction under Rule 60(b)(5) and (6) because continued enforcement of the Plan undermined the public interest by placing authority over immigration policy and foreign affairs in the control of class counsel and the courts, contrary to governing case law. JA123–26 (citing *Horne v. Flores*, 557 U.S. 433 (2009); *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367 (1992)). The Agencies argued that ongoing judicial control of the Agencies' administration of the SIV process impeded the Executive Branch's discretion to reallocate resources as needed to respond to global crises. JA125–26. The Agencies also argued that the injunction was no longer equitable or practicable due to the surge

13

in applications after the Taliban takeover and the inability to conduct statutorily required in-person interviews in Afghanistan. JA126–30.

As an alternative to termination, the Agencies requested the court modify the Plan to take account of these changed circumstances, and accordingly asked for the opportunity to propose a new plan. JA130–31. In response to the Agencies' motion for relief, the Allies cross-moved for clarification and to expand the Plan's scope. *See* JA213.

### D.    District Court Decision on Appeal

On November 30, 2022, the district court granted and denied in part the parties' motions. *See* JA989. First, the court agreed that the Plan was untenable in its current form, although without specifying whether it was applying Rule 54(b) or 60(b). JA993. Revisiting its earlier unreasonable-delay determination, the court recognized that "the factual developments since [September 2019] are both significant and relevant to [its] analysis." JA994. The court appreciated that "[s]ince the court ordered relief in this case, the government's task of timely adjudicating Plaintiffs' visa applications has undoubtably become more difficult." JA995. However, the court concluded that the changes "ultimately do not alter the court's determination that the government's delay in adjudicating Plaintiffs' applications is unreasonable." JA994.

In revisiting its *TRAC* analysis, for Factors 1 and 2 (whether a "rule of reason" governs the time an agency takes to make a decision, and whether Congress has provided a statutory timetable), the court acknowledged "time is the first and most important factor," and found "it is where the government's case for relief is the strongest." JA995 (quoting *In re Pub. Emps. for Env't Resp.*, 957 F.3d 267, 273–74 (D.C. Cir. 2020)). The court credited the Agencies' evidence that "[i]n the wake of" the U.S. withdrawal from Afghanistan, "the monthly volume of SIV case inquiries surged by 816 percent, and the number of new cases grew by 443 percent." JA995–96. The district court further acknowledged that with Embassy Kabul's suspension of operations, "the government lost its ability to conduct the legally required in-person visa interviews for Afghan applicants in Afghanistan," adding an "array of diplomatic, logistical, and other hurdles." *Id.*

Despite recognizing that the "government's simultaneous increase in workload and decrease in processing capacity affect 'the complexity of the task at hand' and 'the resources available to the agency,'" and thus directly bear on the analysis of *TRAC* Factor 1 and whether the timing of adjudications satisfies the rule of reason, the district court held that these changes were insufficient to "alter the court's ultimate determination of unreasonable delay or justify ending court supervision of the government's adjudication process." JA996–97. Instead, the district court emphasized that the statute provides that SIV applications "should be

15

completed not later than 9 months after the date on which an eligible alien submits all required materials," and concluded that Plaintiffs' applications are still pending beyond what it referred to as the "statutory deadline" with no "concrete timetable for adjudicating them." JA996. The court thus held that "the first and [second] *TRAC* Factors still favor Plaintiffs, albeit slightly less heavily than before." JA997.

On *TRAC* Factor 3 (the affected sphere of regulation) and Factor 5 (the nature and extent of the interests prejudiced by delay), the Agencies highlighted that the national security and foreign affairs considerations at play, such as the Afghan and Iraqi security situations, as well as the Plan's intensive reporting requirements that actually hinders timely adjudications. JA997–98. While the court did acknowledge the Agencies' hours devoted to their reporting obligations under the court-ordered adjudication plan, the court also stated that the Agencies "do[] not quantify the opportunity cost of adjudicating Plaintiffs' visas." The court found that this makes "the true impact [on SIV applicants] too speculative to disturb the court's conclusion" that the Agencies' current reporting obligations "are worth ensuring the government's compliance with its legal obligations." JA997. The district court rejected the government's national security and foreign affairs arguments, relying on its previous decision of 2019. *Id*. The district court went on to discuss the increase in class members and that the "government has continued to fail to timely process

SIV applications in the past several years" and held that the "government's delay is more unreasonable under these factors, not less." JA998.

On *TRAC* Factor 4 (agency activities of a higher or competing priority), the district court held that the government did "not proffer any specific agency activities that would be adversely affected" by court-ordered relief. JA999. The court recognized, but rejected as not dispositive, many urgent claims on the Agencies' resources and attention, such as their "commitment to provide assistance to address global events such as the Ukrainian refugee crisis, [the] COVID-19 visa backlog, the civil war in Ethiopia, and the lack of consular services in Moscow." *Id.* The court declined to "alter its determination that this factor is either neutral or weighs in favor of Plaintiffs." *Id.*

As it had in 2019, the court found it unnecessary to address *TRAC* Factor 6 (whether the agency acted in good faith), assuming without deciding no agency impropriety existed. *Id.* Thus, the district court stood by its earlier unreasonable delay determination despite the new *TRAC* analysis. JA999.

Finally, the court denied without analysis the Agencies' alternative Rule 60(b) argument for termination of the adjudication plan as no longer equitable, in the public interest, or practicable. JA993–94 ("As a threshold matter, the court need not decide whether Rule 54(b) or Rule 60(b) governs . . . ."). Instead, because the court determined that unreasonable delay existed under *TRAC*, it held plan modification

17

was warranted and eschewed evaluation of termination. In so holding, the court rejected without analysis the Agencies' alternative argument that, if the September 2019 order was a final order, termination of the judicially imposed adjudication plan was warranted under Rule 60(b) in view of changed circumstances outside of the context of an unreasonable delay determination under *TRAC*. *Id.*

Although the court refused to terminate the order under either rule, it concluded that the "intervening events justify some modifications to the 2020 Plan." JA999. The court ordered a new adjudication plan and referred the "case to a magistrate judge to oversee [its] development," and ordered a period of discovery. JA1000, 1003. The Agencies now appeal.[3]

## SUMMARY OF THE ARGUMENT

The district court erred in ruling that the Agencies were still delaying adjudication of Afghan and Iraqi SIV applications in November 2022, to the point of an Administrative Procedure Act "unreasonable delay" violation. A proper evaluation under *TRAC* favors the Agencies. Under Factors 1 and 2 (the rule of

---

[3] Following the court's November 30, 2022 order, the Allies conducted limited discovery including written discovery and organizational depositions. *See* JA1000. Pursuant to the court's order, on February 2, 2023, the Agencies filed a proposed new modified plan, and the Allies filed objections. *See* JA1047. Following notice of the instant appeal, Magistrate Judge Upadhyaya rejected the Agencies' argument that the district court was divested of jurisdiction to enter a new plan or conduct further proceedings related to the injunction. JA1047–48. The Agencies filed objections to that decision, which remain pending. *See* JA1048.

reason and statutory timeline), the court failed to correctly weigh the challenges to the SIV program in light of significant events in Afghanistan and Iraq or the Agencies' improvements to SIV processing. The court's overreliance on the discretionary nine-month timetable in the Acts truncated that analysis. In fact, notwithstanding those global challenges, and due in large part to the Agencies' restructuring and streamlining of the SIV program since 2019, the Agencies have reported a decline in average processing times for SIV adjudications. The court's application of Factors 3 and 5 (the nature of the interests implicated by agency delay) ignored that the Agencies must consider all aspects of health and welfare, not just SIV class members. The unprecedented competing priorities under Factor 4—such as the Ukrainian war and COVID-19—are enough to swing this Factor in the Agencies' favor. Finally, the court did not address the Agencies' good faith efforts to complete all SIV application steps as expeditiously as possible under Factor 6.

The injunction against the Agencies therefore should have been vacated, whether the Agencies' motion is analyzed under Rule 54(b) or Rule 60(b). As to the Agencies' alternative request for relief under Rule 60(b), the court failed to address whether—separate and apart from the *TRAC* undue delay determination—judicial superintendence continued to be equitable, practical, and in the public interest given significant changed circumstances brought about by engagement of the political branches and global developments. Processing-and-reporting injunctions, of the sort

the court previously issued and is likely to approve in revised form, unnecessarily burden agency resources—the same resources that are essential to adapt quickly to humanitarian and foreign-policy crises around the globe. As the Supreme Court has admonished, "the passage of time frequently brings about changed circumstances— changes in the nature of the underlying problem, changes in governing law or its interpretation by the courts, and new policy insights—that warrant reexamination of the original judgment." *Horne*, 557 U.S. at 448. This Court should reverse the district court and terminate the injunction.

## STANDARD OF REVIEW

A Rule 54(b) decision is reviewed for an abuse of discretion. *Cobell v. Jewell*, 802 F.3d 12, 23 (D.C. Cir. 2015). "A district court by definition abuses its discretion when it makes an error of law." *United States v. Trabelsi*, 28 F.4th 1291, 1297 (D.C. Cir. 2022). Because the Rule 54(b) motion turned on a correct application of *TRAC*, and because this Court reviews *TRAC* unreasonable-delay applications *de novo*, *Cobell v. Norton*, 240 F.3d 1081, 1096 (D.C. Cir. 2001), the Court's Rule 54(b) *TRAC* "review is effectively de novo" here. *See Trabelsi*, 28 F.4th at 1297. Any "factual findings that underlie that determination" are reviewed for clear error. *Cobell*, 240 F.3d at 1096.

The district court's denial of a Rule 60(b) motion is reviewed for abuse of discretion. *Smalls v. United States*, 471 F.3d 186, 191 (D.C. Cir. 2006). "A district

court abuses its discretion when it applies the wrong legal standard . . . ." *Shatsky v. Palestine Liberation Org.*, 955 F.3d 1016, 1031 (D.C. Cir. 2020).

## ARGUMENT

## I. THE DISTRICT COURT FAILED TO PROPERLY EVALUATE THE *TRAC* FACTORS UNDER RULE 54(b)

### A. Legal Standard Under Rule 54(b)

Under Federal Rule of Civil Procedure 54(b), a district court may revise "any order or other decision, however designated, that adjudicates fewer than all of the claims . . . at any time before the entry of" final judgment. Fed. R. Civ. P. 54(b). District courts have discretion to hear motions under Rule 54(b) "as justice requires." *Capitol Sprinkler Inspection, Inc. v. Guest Services, Inc.*, 630 F.3d 217, 227 (D.C. Cir. 2011) (internal quotation marks omitted). "The considerations embedded in the 'as justice requires' standard leave a great deal of room for the court's discretion" and, accordingly, the standard amounts to a determination "'whether relief upon reconsideration is necessary under the relevant circumstances.'" *Hisp. Affs. Project v. Perez*, 319 F.R.D. 3, 6 (D.D.C. 2016) (internal citations omitted). The district court here elected to grant reconsideration and performed a new *TRAC* analysis. *See* JA994.

Courts should not intervene into an agency's administration of a program unless the agency's delay is "so egregious" as to warrant relief. *TRAC*, 750 F.2d at 79. Six factors guide that determination: (1) the rule of reason; (2) any statutory

21

timetable or other indication of the speed with which Congress expects the agency to proceed; (3) health and welfare considerations, if at stake; (4) how competing priorities on the Agencies' resources affect any delay; (5) the nature and extent of the interests prejudiced by delay; and (6) whether there is any agency bad faith. *See id*. at 80. No one factor is determinative, and "[e]ach case must be analyzed according to its own unique circumstances." *Air Line Pilots Ass'n, Int'l v. Civil Aeronautics Bd.*, 750 F.2d 81, 86 (D.C. Cir. 1984).

### B. Agencies Are Reasonably Processing SIV Applications Under a New Regime of Streamlining Measures, Restructuring, and Other Process Improvements Since 2019 Under *TRAC* Factors 1 and 2

#### 1. The District Court's Overreliance on the Nine-Month Statutory Benchmark Improperly Overshadowed the Changed Circumstances Under TRAC Factors 1 and 2

The district court erred in analyzing the first and second *TRAC* factors because it failed to consider any purported delays in the context of the unique challenges presented by the SIV program. The first and second *TRAC* factors are typically considered together and ask whether the agency's timeline conforms to a "rule of reason," which is a flexible assessment of the context of the agency's action. *Mashpee Wampanoag Tribal Council, Inc.* v. *Norton,* 336 F.3d 1094, 1102 (D.C. Cir. 2003). Consistent with these principles, before enjoining an agency to alter its processing rate, a court must consider, in detail, the circumstances of the agency

action at issue—and not just compare the alleged delay with an idealized timeframe. *See id.*

As an initial matter, the district court erred by excessively relying on the nine-month Congressional benchmark for its unreasonable delay determination. Although the nine-month congressional benchmark is significant, it is just that—a benchmark—and not a mandatory deadline. As recently as July 2021, Congress amended the RCIA and AAPA to explicitly include the COM approval phase in the nine-month period. ESSAA § 401(a)(3). As it had done before, Congress provided that the Agencies "should" complete processing under the specific terms. *Id.* ("[A]ll steps [under government control] should be completed not later than 9 months . . . ."). "Should," unlike "shall," is not a word that imposed mandatory duties. *Jolly v. Listerman*, 672 F.2d 935, 945 (D.C. Cir. 1982) ("The use of the word 'should' . . . detracts significantly from any claim that this guideline is more than merely precatory."); *United States v. Maria*, 186 F.3d 65, 71 (2d Cir. 1999) ("'[S]hould' implies, suggests, and recommends, but does not require.").

This Court emphasizes a totality-of-the-circumstances approach to *TRAC* because the mere presence of a statutory timetable (Factor 2) does not supplant the overarching rule of reason (Factor 1). *See Cutler v. Hayes*, 818 F. 2d 879, 898 (D.C. Cir. 1987) (absent bad faith, courts should "consider the agency's explanation, such as necessity, insufficient resources, or the complexity of the task confronting the

23

agency"). This is because, as Congress has consistently and recently recognized, this benchmark, while an important marker for the Agencies' adjudication efforts, might be unattainable despite the Agencies' best efforts. Thus, where "Congress deemed it unwise to impose a rigid timetable on [an agency]; [courts] are not free to ignore that judgment and rewrite the statute to include a specific timetable." *See In re Am. Fed'n of Gov't Emps.*, 837 F.2d 503, 506 (D.C. Cir. 1988). A strict-timetable approach is especially inappropriate where, as here, the Agencies administer a complex process that requires review of extensive submissions. *See Wang v. Blinken*, 3 F.4th 479, 483 (D.C. Cir. 2021) ("[W]e require clearer legislative direction than just the relocation of unaltered statutory text before adopting a reading of the statute that effects the type of sweeping and monumental change in immigration policy that the Plaintiffs' reading of the statute would cause."). The district court's misinterpretation of the nine-month benchmark obstructed a sound inquiry into the many extraordinary circumstances confronting the Agencies since 2019—and the Agencies' responses to those circumstances, as explained below.

## 2. The District Court Failed to Consider Improved Processing Times

The district court's dependence on the nine-month benchmark to make its unreasonable delay finding disregards the Agencies' evidence of improved SIV adjudication rates during the pendency of this lawsuit and stay of the Plan. The district court implicitly held that *any* delay exceeding nine months is unreasonable.

24

*See, e.g.*, JA996 ("[T]he fact remains that Plaintiffs' applications are still pending beyond the statutory deadline and the government has not provided any concrete timetable for adjudicating them.").

But the court failed to grapple with the significant reduction in average processing times since its 2019 *TRAC* analysis and the totality of circumstances evaluation required for *TRAC* Factor 1. When performing its first *TRAC* analysis in 2019, the district court concluded that SIV applicants waited two and a half to five years for COM approval alone in each of the Afghan and Iraqi programs. JA4.[4] Because this figure far exceeded the nine months (or approximately 270 days) benchmark identified in the Acts, RCIA § 1242(c)(2); AAPA § 602(b)(4)(B), the district court held that there was unreasonable delay.

Contrast that with 2022. By the second quarter of fiscal year 2022, the Agencies had cut the total average processing time by a third, to 587 days, for the Afghan SIV program and in half, to 440 days, for the Iraqi SIV program. JA113. And as the Agencies informed the district court before it issued its order, the average processing times remained roughly the same for the Afghan SIV program at 589 days, and fell even further for the Iraqi SIV program to 263 days—the latter even below the 270-day benchmark in the Acts. JA983–84. The Agencies' most recent

---

[4] The Agencies' average processing time charts calculate 912.5 days for the 2019 *TRAC* analysis. This calculation comes from the district court's finding that SIV applicants wait 2.5 to 5 years for COM approval alone. JA4.

congressional report, from the first quarter of fiscal year 2023, shows that average processing times have fallen even further: average processing times at government steps are 314 days (approximately 10 months) for the Afghan SIV program and 239 days (under eight months) for the Iraqi SIV program.[5] *Cf.* JA983 (noting that even the latest reports before the district court did not account "for more recent changes" implemented by the Agencies since 2019). The below charts illustrate the Agencies' progress and the health of the SIV program since the 912.5-day processing times at issue in the court's 2019 *TRAC* analysis:[6]

---

[5] *See* U.S. Dep't of State, *Report of the Afghan SIV Program–January 2023*, https://travel.state.gov/content/dam/visas/SIVs/Afghan-Public-Quarterly-Report-Q1-Jan-2023.pdf; *Report of the Iraqi SIV Program–January 2023*, https://travel.state.gov/content/dam/visas/SIVs/Iraqi-Public-Quarterly-Report-Q1-Jan-2023.pdf. The Court may take judicial notice of these reports, which were submitted to Congress. *See* Fed. R. Evid. 201(d) ("The court may take judicial notice at any stage of the proceeding."); *see, e.g.*, *Herron v. Fannie Mae*, No. 10-943, 2012 WL 13042852, *2 (D.C. Cir. Mar. 28, 2012) ("[T]he public records of federal agencies are a proper subject of judicial notice . . . .").

[6] Given the continuing uptick of applications, average processing times may increase for this dynamic immigration program. *See supra* note 5.





The district court based its 2019 decision on a two-and-a-half to five-year delay for COM approval, a delay that has decreased substantially, as reflected in the Agencies' reports to Congress. *See* JA4; *supra* at 27 (average processing times charts).

Even if the Acts' nine-month timetable *were* mandatory—and it is not—the district court should not have stopped its analysis of Factors 1 and 2 there. *See In re Barr Labs.*, 930 F.2d 72, 75 (D.C. Cir. 1991) (an agency's failure to meet a statutory deadline "does not, alone, justify judicial intervention"). There is no "*per se* rule as

27

to how long is too long to wait for agency action." *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004) (citation omitted). The Court "has not hesitated to deny [*TRAC* claims] even when an agency has missed a statutory deadline by far more than . . . two years." *In re Aiken Cnty.*, 725 F.3d 255, 268 (D.C. Cir. 2013) (Garland, C.J., dissenting); *see also, e.g.*, *Mashpee*, 336 F.3d at 1100–01 (vacating and remanding the district court's determination that a five-year delay was unreasonable); *Grand Canyon Air Tour Coal. v. FAA*, 154 F.3d 455, 477–78 (D.C. Cir. 1998) (declining to order agency action notwithstanding a ten-year delay in issuing a rule and a 20-year delay in achieving the rule's statutory objective); *cf. TRAC*, 750 F.2d at 81 (delays of approximately five years and two years by the agency did not warrant mandamus, but prompted the Court to retain jurisdiction); *Potomac Elec. Power Co. v. ICC*, 702 F.2d 1026, 1035 (D.C. Cir. 1983) (eight-year delay unreasonable). Here, the Agencies were not years beyond the congressional benchmark; they were, as of the last reporting before the court issued its order, 319 days past the benchmark on average for Afghanistan and seven days *below* the benchmark on average for Iraq, with a general downward processing-time trend.

3.    *The Court Failed to Appreciate the Foreign Affairs and National Security Concerns Inherent in the SIV Program*

In concluding that the Agencies' adjudication of SIV applications continued to be unreasonably delayed, the district court failed to weigh the dramatically changed circumstances facing them. On one hand, the court recognized that "the

28

government's task of timely adjudicating Plaintiffs' visa applications has undoubtably become more difficult." JA995. Yet it also held that "the difference in weight" of the Agencies' evidence did not change its 2019 unreasonable delay finding or justify ending court supervision, citing only three sentences from the Agencies' declarations. JA995–97. In 2019, the court credited the Agencies' "obligation to balance national security with individual eligibility for a visa" before issuing the Plan. JA11. Since that time, the Agencies have faced a series of world events, and yet the district court appeared unmoved by that fact and by the Agencies' compelling need to reallocate resources in response to such crises. Nor did the district court take adequate account of the record high number of applicants and implemented improvements since 2019.

As part of *TRAC* Factor 1, courts should recognize the broad authority Congress and the agencies have in immigration matters. *See Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972) (Congress has "plenary power to make rules for the admission of aliens and to exclude those who possess those characteristics which Congress has forbidden"); *Skalka v. Kelly*, 246 F. Supp. 3d 147, 153–54 (D.D.C. 2017) ("Congress has given the agencies wide discretion in the area of immigration processing."). "Few interests can be more compelling than a nation's need to ensure its own security," *Wayte v. United States*, 470 U.S. 598, 611–12 (1985), and consular officers' visa determinations are "matters touching on national security," *Saavedra*

29

*Bruno v. Albright*, 197 F.3d 1153, 1162 (D.C. Cir. 1999). While Congress wanted the Agencies to process SIV applications expeditiously, it also required thorough vetting of those applications—which takes considerable time. At every stage of the SIV process, the Agencies must intensively screen and investigate the backgrounds of each applicant. At the COM approval stage, Congress requires a "risk assessment" of the applicant and an "independent review of records" maintained by the hiring organization to ensure that the applicant did, in fact, assist the U.S. mission as represented. *See* RCIA § 1244(b)(4)(A), AAPA § 602(b)(2)(D)(i)(a). At the visa petition stage, Congress requires the applicant to clear a "background check and appropriate screening." *See* 8 U.S.C. § 1153(f); RCIA § 1244(a)(4); AAPA § 602(b)(1)(D). At the visa application stage, Congress requires the applicant to submit police, prison, and military records, and requires the State Department to liaise with other agencies on security issues and to refuse a visa if the applicant is inadmissible. 8 U.S.C. §§ 1105(a), 1202(b), (e), 1204; RCIA § 1244(a)(2); AAPA § 602(b)(1)(B). All throughout, the Acts afford the Agencies time to ensure that national security concerns are vetted. RCIA § 1242(c)(2); AAPA § 602(b)(4)(B). The Agencies also faced the additional hurdle that unlike unreasonable delay claims involving a *single* agency, *see, e.g.*, *Barr Labs.*, 930 F.2d at 74, the Acts require coordination among at least three departments: State, Defense, and Homeland Security, *see, e.g.*, RCIA §§ 1242(c)(1), 1244(a), (c)(1), (e); AAPA §§ 602(b)(1),

30

(4)(A), (6), (11)–(13). Against that background, the Agencies proved that the average processing times satisfy the rule of reason.

> 4. *The Massive Influx of SIV Applications in Response to the U.S. Withdrawal from Afghanistan, Strain Improvements Since 2019*

The Agencies improved processing times despite a massive increase in SIV applications. The ESSAA amendments broadened SIV eligibility, and the Taliban takeover of Afghanistan led to a massive influx of applications in late 2021. *See* JA153. The State Department received more email inquiries in August and September 2021 (352,476 inquiries) than it did during the preceding almost six years combined. *Id.* The Agencies did not sit by in response to those developments. To the contrary, they increased staffing and implemented streamlining technology. JA141, 176–78, 181–82, 205–06; *see id.* 101–02. They implemented fundamental changes to the SIV program, such as collapsing the COM application with Form I-360 petition, so that eligible applicants only need to submit one filing to the State Department to satisfy both requirements. *See infra* at 34 (discussion of SIV injunction step changes).

These changes bore results. By October 2022, the State Department faced a backlog in email inquiries and document submissions at the pre-COM phase because of the surge in applicants. The agency eliminated that backlog after training 204 SIV case processers (up from nine SIV case processors in fall 2019) to respond to inquiries and process COM application materials. JA978–79, 987–88. The State

Department has implemented a 10-business day turnaround time for emails sent to the Afghan SIV application inbox. JA978–79.

The unprecedented increase in applications faced by the Agencies while superintending this immigration benefit is akin to the increase in applications in *Mashpee Wampanoag Tribal Council*, 336 F.3d at 1100–01. In that case, the Mashpee applied to the Bureau of Indian Affairs for recognition as an Indian tribe, but the agency did not respond for five years. *Id.* 1100. In reversing the district court's determination of undue delay, this Court emphasized that a recent increase in applications exacerbated the agency's shortage of resources to undertake the "extremely complex and labor-intensive task" of tribal recognition, with no corresponding increase in appropriations from Congress. *Id.* 1100. The Court criticized the district court for failing to account for the agency's "limited resources" and "competing priorities," noting that there was no evidence the agency had treated the Mashpee differently from anyone else or that idle agency officials were just "'twiddling their thumbs.'" *Id.* at 1100-01 (quoting *Barr Labs.*, 930 F.2d at 75). As in *Mashpee*, the Agencies were confronted with an unparalleled uptick in applications implicating a complex and sensitive task, but nonetheless quickly recognized and responded, to positive results.

32

5.   *Interagency Changes to the SIV Application Lifecycle Revamped the SIV Program and Hastened the Pace of Adjudications*

The rule of reason must also consider interagency operational changes that have reduced delay and rendered any residual delay reasonable. The Agencies have made such changes to each major stage of the SIV program. The first phase of the SIV process is applying for COM approval. The Acts contemplate a steady stream of applications—not the unprecedented increase that the Agencies faced after August 2021 when the Taliban took Kabul and spurred Embassy Kabul to suspend its operations. Notwithstanding this increase, the Agencies eliminated the verification process for those applicants who worked for U.S. government agencies and the requirement that the employers provide letters of recommendations. JA187–89. In August 2021, the COM for Afghanistan dissolved the committee that had previously been reviewing applications, eliminating unnecessary steps in the process and decreasing COM decision time by approximately two weeks. JA187. The second phase of the original SIV process was petitioning USCIS with a Form I-360 to confirm that the applicant has a qualifying relationship with U.S. or coalition forces. In July 2022, the State Department and USCIS collapsed the petition phase into the COM phase. JA888–89. Under this new process, the State Department reviews all required documents for COM approval. *Id.* The Plan's current Steps 6 and 7 are now only relevant for a small subset of applicants with applications pending before the change went into effect. JA72, 889.

33

The third phase of the SIV process is applying for an immigrant visa to come to the United States. In assessing delay, the district court here noted the government's responsibility to timely schedule visa-application interviews, JA996; *see* 8 U.S.C. § 1202(e), but these are no longer possible in Afghanistan after the suspension of operations at Embassy Kabul and severely limited in Iraq following a rocket attack on Embassy Baghdad. *See* JA160–61, 170, 174. Although the district court did acknowledge that the U.S. withdrawal from Afghanistan precluded in-person interviews, it did not account for the fact that interviews are statutorily required or that the delay is attributable to developments beyond the Agencies' control given the need for applicants to travel to a third-country post for consular interviews.

6.    *The COVID-19 Pandemic and Iraq Security Situation Inhibited Adjudications*

The district court also failed to acknowledge the continued challenges of COVID-19 and instability at Embassy Baghdad. *Contra* JA996–97 (finding that "some of the changes" identified by the Agencies "are not changes at all"). The COVID-19 pandemic drastically reduced the number of U.S. officials and locally employed staff who could legally or safely conduct business at a consular section on any given day. JA145–46. Although many services have resumed, the State Department is now working through the backlog (*see supra* at 17) and navigating ongoing COVID-19 restrictions. The district court's failure to account for the years-

34

long pandemic in the rule of reason was error under this Circuit's case law. *See, e.g.*, *Mashpee*, 336 F.3d at 1101–02 (holding the district court erred when it failed to consider the agency's "limited resources"); *Khan v. Blinken*, No. 21-cv-1683 (JEB), 2021 WL 5356267, at *3 (D.D.C. Nov. 17, 2021) ("Given that courts have countenanced far longer processing delays under pre-pandemic circumstances, the Court finds no basis to conclude that the Government's timeline for adjudicating [plaintiff]'s application lacks reason, especially given the logistical challenges that COVID-19 has imposed."); *see also Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam) ("Stemming the spread of COVID-19 is unquestionably a compelling interest . . . .").

Instability at Embassy Baghdad continues to affect the Iraqi SIV program. From March 2020 until June 2021, Embassy Baghdad staffing was primarily limited to two consular staff members. JA162. The embassy still has not fully reopened for routine in-person appearances, and the State Department's ordered departure remains in place. *Id.* Embassy Baghdad continued to suffer insurgent attacks as recently as January 2022. JA160–62. The court should have weighed these changed circumstances in favor of the Agencies as part of a complete, up-to-date *TRAC* analysis, instead of merely dismissing these ongoing issues as previously considered three years earlier.

* * *

The rule of reason shows why no egregious delay persisted here. The district court misapprehended the nine-month benchmark, ignoring the demands Congress has placed on the SIV application process, world events that could not have been anticipated when the court's initial injunction was entered, and the Agencies' diligent and substantial improvements to the program's administration. *See supra* at 29–34. Yet the average processing times plummeted from about 912.5 days back in 2019 to 589 days for the Afghan SIV program and 263 days for the Iraqi SIV program by the time the district court issued its order. Given all these circumstances, *TRAC* Factors 1 and 2 favor the Agencies.

## C.    Factors 3 and 5 Favor the Agencies Because the SIV Program Implicates Foreign Affairs, Immigration, and National Security Decision-Making

*TRAC* Factors 3 and 5, both of which consider the nature of the interests implicated by any agency delay, overlap in this case. "The third looks to whether human health and welfare are at stake—in which case compulsion is more justified—and the fifth assesses the nature and extent of the interests prejudiced by delay." *Ctr. for Sci. in the Pub. Int. v. U.S. Food & Drug Admin.*, 74 F. Supp. 3d 295, 304 (D.D.C. 2014) (internal quotation marks omitted). The district court concluded that the "government's arguments for reconsideration do not move the needle" and "[i]f anything, the third and fifth *TRAC* factors weigh more heavily for

36

Plaintiffs than they did in [2019]," JA997–98. But the district court did not consider or discuss the Agencies' efforts to improve processing for SIV applicants during unprecedented events that implicate the Executive's foreign policymaking.

The Agencies do not in any way minimize the serious human health and welfare interests at stake in the SIV program. But those factors favor how the Agencies have addressed the pace of adjudications. *First*, Congress has directed the Agencies to stringently vet SIV applicants at several stages to protect national security. Congress mandated that the Agencies conduct "a background check and appropriate screening" on an SIV applicant, among other measures. RCIA § 1244(a)(4); AAPA § 602(b)(1)(D). Indeed, Congress made clear that its nine-month benchmark "shall [not] be construed to limit the ability of [the agencies] to take longer than 9 months . . . in high-risk cases for which satisfaction of national security concerns requires additional time." RCIA § 1242(c)(2); AAPA § 602(b)(4)(B). In this way, Congress required "respect for the autonomy and comparative institutional advantage of the executive branch." *Barr Labs.*, 930 F.2d at 74.

More generally, judicial restraint is necessary here because the Allies' claims implicate complex national security and diplomatic concerns. Separation-of-powers principles vest control over appropriations in Congress and require the agency to perform its duties using the resources provided by Congress. *See OPM v. Richmond*,

496 U.S. 414, 424 (1990). Foreign affairs issues are even more sensitive: "Any policy toward aliens" is "so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952); *see Mathews v. Diaz*, 426 U.S. 67, 81 (1976) (finding that immigration policy involves "changing political and economic circumstances" that are best suited for Legislative or Executive decisionmaking); *cf. Grand Canyon Air Tour Coal.*, 154 F.3d at 476 ("[W]e are acutely aware of the limits of our institutional competence in the highly technical area at issue in this case."). Immigration, foreign affairs, and national security judgments concerning SIV processing go to "the very heart of the expertise that should be exercised by a U.S. Government official who is intimately familiar with the facts [overseas] and not a District Court judge who is ordering agency action in Washington, D.C." *Skalka*, 246 F. Supp. 3d at 154; *cf. Nine Iraqi Allies v. Kerry*, 168 F. Supp. 3d 268, 297 (D.D.C. 2016) (acknowledging in a SIV delay case that "[w]hat efforts are reasonable will depend upon 'complex concerns involving security and diplomacy' far beyond the expertise of the Court—but squarely within that of the Secretary") (citations omitted). Courts have recognized that even a delay "problem stem[ming] from a lack of resources" is "'a problem for the political branches to work out.'" *Mashpee*, 336 F.3d at 1101 (quoting *Barr Labs.*, 930 F.2d at 75).

While the Agencies recognize the dangerous conditions many SIV applicants face in Afghanistan and Iraq and are making strenuous efforts to approve meritorious SIV applications, the Agencies are best positioned to manage the SIV program in the best interests of both SIV applicants and the public interest. The Agencies have addressed these hurdles through Executive initiatives from the U.S. withdrawal from Afghanistan and continued programmatic infrastructure changes that have resulted in decreased processing times. *See supra* at 31–32. Courts should not, as the district court did here, "traverse the thicket of thorny foreign-policy issues" that "would impermissibly encroach upon the discretion that the Constitution affords the political branches to conduct foreign affairs." *Mobarez v. Kelly*, 187 F. Supp. 3d 85, 90 (D.D.C. 2016). This is especially the case where the Executive is in an ongoing dialogue about the program with Congress. *See, e.g.*, ESSAA (one of many congressional amendments to the Acts); *Council of & for the Blind of Del. Cnty. Valley, Inc. v. Regan*, 709 F.2d 1521, 1526 (D.C. Cir. 1983) (en banc) (noting that "Congress' oversight function was further aided" by an annual reporting requirement—much less frequent reporting than the quarterly congressional reports required for the SIV program).

The district court discounted these weighty concerns by finding that "foreign affairs and national security" are "irrelevant to [the Allies'] health, welfare, and other interests jeopardized by the government's delay." JA997. But that misinterprets

39

*TRAC.* Factors 3 and 5 consider the *whole* of the Agencies' actions, not just SIV class members' health and welfare and how it affects them, although that is a crucial priority for the Agencies. And, the Agencies must carefully consider any security issues raised by the SIV applications. *See Sierra Club v. Thomas*, 828 F.2d 783, 798 (D.C. Cir. 1987) ("[T]his factor alone can hardly be considered dispositive when, as in this case, virtually the entire docket of the agency involves issues of this type."); *see also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (prohibiting plaintiffs from launching "broad programmatic attack[s]" on how an agency operates a program); *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010) ("[C]ourts are not a forum for reconsidering the wisdom of discretionary decisions made by the political branches in the realm of foreign policy or national security.").

The district court also erred in finding it had "already heard and rejected" similar arguments back in 2019, when later developments highlight the gravity of the interests the United States must weigh in 2022. JA997; *Lin v. D.C.*, 47 F.4th 828, 839 (D.C. Cir. 2022) ("Revisiting a ruling as legal issues develop over the course of litigation falls squarely within Rule 54(b)'s wheelhouse."). Unquestionably, the Taliban takeover precipitated a humanitarian crisis that exponentially increased the Agencies' workload processing applications from those attempting to flee the country. *See* JA99–101. Notwithstanding, the United States provided aid to SIV

40

applicants by facilitating flights via Operation Allies Refuge in July 2021 and, once

Afghans arrived at the United States, Operation Allies Welcome in August 2021.

*See* JA99, 121–22. The Agencies continue to assist SIV applicants with arrival to

third-country processing sites, such as Doha, Qatar, before potential onward travel

to the United States, *see* JA150, but these efforts require negotiations with the

Taliban to allow applicants to exit Afghanistan. Challenges on restrictions and

limitations on applicants' ability to travel, which are the subject of ongoing

diplomatic engagement, cannot be resolved simply by devoting more resources to

visa processing, although the Agencies are certainly doing so. *See* JA149–53. The

health and human welfare interests that the Agencies are accommodating look very

different than they did in 2019.

  *Second*, the Agencies' need to temporarily suspend in-person interviews and

to temporarily reduce staff was driven by a health and safety concern in the first

place—the urgent need to slow transmission of COVID-19, either on the Agencies'

initiative or at the behest of host countries. At the onset of the COVID-19 pandemic,

the Agencies temporarily suspended routine visa services at all U.S. embassies and

consulates for public health reasons and to comply with local host country pandemic

restrictions, resulting in a backlog of visa applications. JA145–47. The pandemic

drastically reduced the number of people, including visa applicants, U.S. citizens

seeking overseas services, U.S. officials, and locally employed staff, who could

41

legally or safely conduct business at a U.S. embassy or consulate on any given day. JA145. Ensuring the health and safety of *all* these individuals is a core Factor 3 and 5 concern: *TRAC* must account for the health and safety of others beyond the class, such as other SIV applicants, U.S. government employees, and the host countries themselves. *See Sierra Club*, 828 F.2d at 798 ("[W]hether the public health and welfare will benefit or suffer from this particular rulemaking depends crucially upon the competing priorities that consume [the agency's] time, since any acceleration here may come at the expense of delay of [agency] action elsewhere.").

*Third*, the Agencies' responses to terrorism significantly impacted the physical safety of the Allies as well as consular staff abroad. As for the Iraqi SIV program, the continuing precarious security situation impacts the safety of anyone who enters the Embassy compound. JA157–58. Last year, four rockets targeted the embassy. JA160–61. At the time of the Agencies' motion, the embassy's three primary access points remained damaged and unusable. JA157–58. Without usable access points, the Embassy lost the ability to seamlessly screen and move SIV and non-SIV applicants safely. *Id.* Any delays are reasonable where the Agencies' competing national security and foreign policy demands required prioritizing the health and safety of SIV applicants and non-SIV applicants alike.

*Fourth*, the competing equities articulated by the district court do not overcome the health and welfare considerations implicated by such State

Department and USCIS priorities as evacuating citizens from countries in crisis, helping resettle citizens from those countries, mitigating the risk of COVID-19, cooperating with host country restrictions, and responding to emergencies affecting both SIV applicants and U.S. government personnel. The district court chided the Agencies for not "quantify[ing] the cost of adjudicating Plaintiffs' visas" in evaluating the administrative costs of tracking and reporting requirements presented in the Agencies' Motion. JA997. But the Agencies did exactly that; they calculated and informed the district court of the hours they spent adjudicating SIV applications. JA116–17. The court's undue focus on the visa applications *in isolation* is also incompatible with *TRAC*. *See Cutler*, 818 F.2d at 897 (emphasizing *TRAC*'s totality of the circumstances approach).

Finally, the court ignored how the injunctive Plan was itself increasing "the cost of adjudicating" class members' visas. *See* JA997. The Plan requires the Agencies to submit quarterly reports tracking class members through all Plan steps (many of which are now obsolete, see *supra*) and assess performance against those benchmarks. JA116. This requires the Agencies to track individual class members manually throughout multiple government information-technology systems. JA183. These reports are in addition to the quarterly reports that Congress already requires the Agencies to submit. *See supra* at 8; *see, e.g.*, ECF No. 138 (July 2021 Plan progress report). The Plan also requires the parties to meet and confer on the

43

Agencies' performance reporting if the Allies want to challenge the Agencies' explanation. *See* JA116. The resources devoted to reporting under the Plan are significant. In July 2021, "State Department staff reported that they expended approximately 141 hours per week on litigation-related efforts, with an additional 40 hours expended in the two weeks prior to the submission to the [July 2021 progress report]." *Id.*; *see also* JA154–55 (outlining dedicated hours to the SIV program). Any labor by the Agencies to complete reporting under an adjudication-plan injunction diverts Agency resources away from adjudicating SIV applications.

The district court also incorrectly cited as a "significant development" that more SIV applicants have joined the class since 2020. JA998. While the sheer number of applicants is relevant, it is not dispositive, because the Agencies continue to adjudicate class members' applications at a reasonable *pace*. As discussed above, the Agencies continue to decrease processing times despite the massive influx of SIV applications.

The Executive Branch's expertise managing the SIV program extends "far [beyond] that of the [District] Court." *See Nine Iraqi Allies*, 168 F. Supp. 3d at 297. Factors 3 and 5 favor the Agencies, and this Court should reverse the district court's conclusion.

**D.    *TRAC* Factor 4 Favors the Agencies Because the Need to Review and Rigorously Screen Application Materials Vies for Limited Agency Resources**

*TRAC* Factor 4 considers how compelling agency action would affect "agency activities of a higher or competing priority." *TRAC*, 750 F.2d at 80; *see also Mashpee*, 336 F.3d at 1100–02 (district court erred by disregarding the importance of "competing priorities" for limited resources in finding a five-year delay in agency action constituted unreasonable delay). The district court's Factor 4 analysis disregarded the Agencies' many competing priorities since 2019, such as the Agencies' initiatives to help vulnerable Afghans and SIV applicants. JA999.

Considering the tension between expediting delayed action and agencies' competing priorities, this Court has long acknowledged that "[t]he agency is in a unique—and authoritative—position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way." *Barr Labs.*, 930 F.2d at 76. Therefore, "priority-setting in the use of agency resources . . . is least subject to second-guessing by courts." *EMR Network v. FCC*, 391 F.3d 269, 273 (D.C. Cir. 2004); *see Barr Labs.*, 930 F.2d at 76 ("judges have neither the capacity nor the authority" to require measures to improve agency efficiency in its use of resources). Agency considerations of their own limitations and competing priorities are both permissible and entitled to great deference: "If, for example, an order compelling agency action will serve only to delay other important [agency] matters,

45

then the delay in question may be considered reasonable." *Muwekma Tribe v. Babbitt*, 133 F. Supp. 2d 30, 40 (D.D.C. 2000) (citing *FEC v. Rose*, 806 F.2d 1081, 1091 (D.C. Cir. 1986) (finding delay reasonable in part because of the agency's significant competing priorities and refusing to "sit as a board of superintendance" over the agency)). Even where agencies fail to meet a statutory deadline for action, the Court should hesitate to reset agency priorities. *See Action on Smoking & Health v. Dep't of Labor*, 100 F.3d 991, 994–95 (D.C. Cir. 1996) (refusing *TRAC* relief).

Here, the district court did not apprehend how the Agencies have exercised their primary role in allocating their finite resources. *First*, the district court incorrectly asserted that the Agencies "[did] not proffer any specific agency activities that would be adversely affected." JA999. The court wrote off the Agencies' activities as "general 'commitments to provide assistance to address global events.'" *Id.* Like with its Factors 3 and 5 analysis, the district court recited its 2019 *TRAC* analysis, illogically implying that the Agencies previously made these arguments. *Id.*

But the Agencies' motion for relief detailed how circumstances and priorities had evolved since 2019. As the Taliban seized power in Afghanistan, the Department of Homeland Security deployed approximately 400 personnel worldwide to support relocation efforts. JA209. The State Department entered into agreements with many countries to facilitate SIV applicant relocations. JA151–52. Many efforts, including

46

changes to the pre-fly medical exam procedure, and the Agencies' collaboration to employ—for first time ever—electronic proof of visa issuance instead of a passport foil constituted an "all-hands-on-deck response to this crisis." JA147–49, 180. Meanwhile, the Agencies continued their commitment to aid Ukrainian refugees during the Russian invasion that began in 2022, worked through a sustained lack of consular services in Moscow, and attended to the ongoing civil war in Ethiopia. JA200–01. The humanitarian situation in Ukraine illustrates the types of unforeseen circumstances that challenge the Agencies and their implementation of worldwide visa operations. JA200. The visa backlog caused by the COVID-19 pandemic is also unprecedented. None of these crucial foreign policy endeavors can be considered "general 'commitment[s] to provide assistance to address global events,'" and none was apparent in 2019. JA999.

Courts in this Circuit recognize the complex, competing demands that must be considered before finding unreasonable delay. In *Center for Science in the Public Interest*, the district court evaluated an undue delay challenge by a citizens' group that had petitioned the Food and Drug Administration to initiate rulemaking requiring mercury recommendations for certain seafood consumption. 74 F. Supp. 3d at 296. While acknowledging the plaintiffs' important health and safety concerns because "[m]ercury is toxic, especially to young children and developing fetuses," the court declined to impose a judicial remedy. *Id.* Rather, the court determined that

47

by virtue of its very mission, the agency routinely faced difficult decisions about how to prioritize safety initiatives, and "[d]ue to its expertise, the Administration must be permitted flexibility in navigating the tough choices that come along with its expansive safety docket." *Id.* at 305 (citing *Sierra Club*, 828 F.2d at 798 (noting another agency's "very broad mandate" but "finite resources")). The court thus declined to second-guess the agency's "unique—and authoritative—position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way." *Id.* (quoting *Barr Labs.*, 930 F.2d at 76 (refusing mandamus relief even where the Food and Drug Administration had violated a statutory deadline, because issuing such relief, although beneficial to the plaintiff, would likely impose offsetting burdens on other parties equally worthy of agency action)).

By virtue of their missions, the State Department and USCIS on a day-to-day basis must address humanitarian and foreign affairs crises around the globe. The Agencies have made "tough choices" of an incomparable magnitude in this program since 2019. *See Ctr. for Sci. in the Pub. Int.*, 74 F. Supp. 3d at 305; *Foreign Affairs Manual*, 9 FAM 502.5-12(B)(b)(9) (State Department prioritization scheme for SIV applicants). The Agencies have balanced these competing priorities all while implementing initiatives like surging Kabul staff and other embassy locations to assist efforts for U.S.-facilitated flights and rotating staff in third-country embassies to address the influx of SIV applicants. *See* JA141–43, 169–70. The district court

48

did not weigh the toll that almost three years of a global pandemic, the Taliban takeover in Afghanistan, and the war in Ukraine would have on the Agencies' SIV program coordination—even though the Agencies were able to decrease average processing times. *See supra* at 26–29. Factor 4 favors the Agencies.

### E. *TRAC* Factor 6 Favors the Agencies Because They Have Acted in Good Faith

The Agencies have labored to complete all SIV application steps as expeditiously as possible under the challenging circumstances that have unfolded since September 2019. Factor 6 examines whether the agencies acted in good faith. *See TRAC*, 750 F.2d at 80. "[T]he good faith of the agency in addressing the delay weighs against" relief. *Liberty Fund, Inc. v. Chao*, 394 F. Supp. 2d 105, 120 (D.D.C. 2005) (citing *In re Am. Fed'n of Gov't Emps.*, 837 F.2d 503, 507 (D.C. Cir. 1988) (refusing mandamus relief where the agency showed "marked improvement in managing its docket"); *see also Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 192–93 (D.C. Cir. 2016) ("[T]he Secretary's good faith efforts to reduce the delays within the constraints she faces . . . push in the same direction [against concluding that unreasonable delay exists]."). This Court should find that the Agencies' good faith endeavors over the past three years tips the scales in their favor.

As it did in 2019, the district court again "found it unnecessary" to address Factor 6, "assum[ing] without deciding that there is no agency impropriety." JA999. But good faith should still "push in the same direction" as the other factors described

49

above. *See Am. Hosp. Ass'n*, 812 F.3d at 192–93. Before the district court, the Agencies cited specific examples demonstrating how they put SIV applicants at the forefront. For example, the Agencies coordinated Operation Allies Welcome as part of a massive effort to support vulnerable Afghans, including Afghan SIV applicants. JA149–51; JA209–10 (discussing resettlement efforts). The Agencies' good faith efforts "weigh against" the district court's unreasonable delay finding. *See Liberty Fund*, 394 F. Supp. 2d at 105. The Court should reverse the district court's conclusion on this factor.

## II.   THE DISTRICT COURT ABUSED ITS DISCRETION BY DECLINING TO TERMINATE THE INJUNCTION UNDER RULE 60(b)

Assuming the district court's 2019 merits decision is a final judgment, the district court erred in denying the Agencies' alternative request for relief under Rule 60(b). Federal Rule of Civil Procedure 60(b)(5) allows "a court to modify or vacate a final judgment or order if 'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'" *Horne*, 557 U.S. at 447 (quoting *Rufo*, 502 U.S. at 384). "The party seeking relief bears the burden of establishing that changed circumstances warrant relief . . . ." *Id*. Rule 60(b)(6) authorizes relief from a final judgment or proceeding "for any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). Such relief may be granted where

"[e]xtraordinary circumstances" are present. *Ackermann v. United States*, 340 U.S. 193, 199 (1950).

Extraordinary circumstances are present here and termination is in the public interest. The district court nevertheless chose to prolong its almost four-year supervision of the SIV program. That is the very type of long-standing judicial supervision the Supreme Court has disapproved. *See, e.g.*, *Horne*, 557 U.S. at 439; *supra* at 22–24 (discussing that delay is not enough for judicial intervention). Such oversight interferes with the government's exercise of constitutional powers to develop new policies to address the changes in immigration to the United States. *See Petties ex rel. Martin v. District of Columbia*, 662 F.3d 564, 571 (D.C. Cir. 2011) (requiring a full Rule 60(b)(5) inquiry to determine whether "continued enforcement of an order entered to remedy a violation of federal law is unnecessary and improper [because] there is no ongoing violation of federal law and 'a durable remedy has been implemented'"). Although the injunction here has been in place significantly less time than the injunctions at issue in *Horne* and *Petties*, it has no less been superseded by dramatic changes that make clear that continued enforcement is contrary to the public interest. An injunction is no longer equitable where the Agencies are fulfilling their Congressional obligations and continued judicial supervision intrudes on the Executive's decision-making.

51

Further, continued judicial oversight is unwarranted because the Agencies are diligently carrying out their responsibilities and meeting the central purpose of the Approved Adjudication Plan. *See* JA60. "So long as the central purpose of the decree remains intact, . . . it is enough that the district court saw fit to exercise its considerable discretion under Rule 60(b)(5) on the bases that conditions had markedly changed . . . ." *United States v. W. Elec. Co.*, 46 F.3d 1198, 1207 (D.C. Cir. 1995). The Plan's purpose is moot because the Agencies are adjudicating SIV applications at a reasonable pace. *See supra* at 36–37.

**A.**    **Termination Under Rule 60(b)(5) Is Appropriate Because Prompt Return of the SIV Program to the Political Branches Is Required in Institutional Reform Litigation**

A significant change in facts warrants termination of the Plan under Rule 60(b)(5) and (6). In *Horne*, 557 U.S. at 449, which involved institutional reform litigation, the Supreme Court criticized the lower courts for focusing too narrowly on the terms of the decree and not focusing instead on the broader question: "whether, as a result of important changes during the intervening years, the State was fulfilling its obligations under the [law] by other means." *Id*. The Court went on to observe that a "flexible approach" allows courts to "ensure that responsibility for discharging the State's obligations is returned promptly to the State and its officials when the circumstances warrant." *Id*. at 450 (internal quotations omitted). Indeed, the "longer an injunction or consent decree stays in place, the greater the risk that it

52

will improperly interfere with a State's democratic processes." *Id*. at 453. The fact that continued application of the injunction creates a risk of interference with the government's processes provides a basis for the Court to terminate the injunction as no longer in the public interest.

As shown, the confluence of global events such as Taliban takeover of Afghanistan, security crises in Iraq, the pandemic, legislative reform, and Executive action to review and improve administration of the SIV program collectively warrant relief under Rule 60(b). In *American Council of the Blind v. Mnuchin*, 878 F.3d 360, 367 (D.C. Cir. 2017), the Court explained that Rule 60(b)(5) "permits a court to alter an injunction to respond to unanticipated factual changes," at least if they are sufficiently "significant." *Id.* (internal citation omitted). Here, since the injunction was entered in 2019, not only have the factual circumstances in Iraq, Afghanistan, and the rest of the world changed, but both Congress and the Executive have been reforming the SIV program through "significant" statutory amendment and administrative overhaul. *See id.*

The district court's failure to address these arguments as part of a Rule 60(b)(5) request for termination fell short of what is required by *Horne*. As articulated by this Court, analyzing *Horne*, a district court's failure to answer "[t]he question raised [concerning] whether changed circumstances had rendered continued enforcement of the preliminary injunction . . . contrary to the public

interest" was reversible error. *Petties*, 662 F.3d at 571. And in *Rufo*, the Court stressed that "the public interest and considerations based on the allocation of powers within our federal system require that the district court defer to [government officials] who have the primary responsibility for elucidating, assessing, and solving the problems of institutional reform." 502 U.S. at 392 (internal quotations and citation omitted). These concerns are paramount in cases involving immigration, where judicial management represents "a substantial intrusion" into the workings of the political branches entrusted to manage immigration policies. *Cf. Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 n.18 (1977); *see Harisiades*, 342 U.S. at 588–89.

The court's *TRAC* analysis assessing purported delays is insufficient to resolve the Agencies' request for termination under Rule 60(b) as required by *Horne*. The question raised by the Agencies' Rule 60(b) motion was whether changed circumstances had rendered continued injunctive relief contrary to the public interest following engagement by the political branches resulting in improved adjudication pace. Because the court elevated Congress's nine-month adjudication benchmark to near-mandatory status, it declined to engage with the Agencies' broader argument that it is no longer equitable or in the public interest to have a substantial immigration program administered by the court following significant improvements implemented by the political branches and momentous global events affecting this complex

54

immigration, national security, and foreign affairs program. Although the district court did address some policy considerations under *TRAC* Factor 3, the court did not grapple with the many foreign policy equities the SIV program touches upon, namely separation of powers principles. Rather, in its *TRAC* analysis, the court explicitly declined to consider many of these assertions, finding it had "already heard and rejected" similar arguments back in 2019, notwithstanding later developments highlighting the gravity of the interests the United States must weigh in 2022. JA997. The Agencies' motion detailed these specific Rule 60(b) equities to support termination, which the court dismissed without analysis. The court's bypass of the Agencies' arguments in support of termination under Rule 60(b) was an abuse of discretion.

Accordingly, because the Agencies have established it is neither equitable nor in the public interest to continue any judicially imposed adjudication plan where circumstances have shifted dramatically and the political branches require flexibility to continue adapting, this Court should terminate the injunction.

## B.    Termination Under Rule 60(b)(6) Is Appropriate Because Compliance with the Injunction Is No Longer Practicable

The district court also failed to address any of the Agencies' Rule 60(b)(6) arguments. *See* JA129–30. Justice requires termination of the Plan where compliance is no longer practicable. The Rule 60(b) standard is met because the changed circumstances since 2019 are so significant and affect issues "so central to

55

the litigation" that the initial judgment has become "manifestly unjust." *Good Luck Nursing Home, Inc. v. Harris*, 636 F.2d 572, 577 (D.C. Cir. 1980). If the injunction were to stand, the government would be compelled to follow the Plan or a similar adjudication-plan injunction in the future, even though intervening events render compliance impracticable. Any judicially imposed adjudication plan would require the Agencies to meet timing benchmarks and reporting obligations beyond reporting already provided to Congress, notwithstanding the lack of a statutorily mandated deadline, and in full disregard of ongoing, shifting on-the-ground realities. *See* JA130 (discussing unavailability of visa application interviews in Kabul and Baghdad and the massive upsurge in SIV applications). This Court should terminate the injunction because judicial oversight and management of this complex immigration program is no longer just.

## CONCLUSION

For the foregoing reasons, the Court should:

- Reverse the district court's orders of November 30, 2022 and

  December 1, 2022; and

- Vacate the Approved Adjudication Plan.

DATED: May 24, 2023                        Respectfully submitted,

BRIAN M. BOYNTON
   *Principal Deputy Assistant Attorney*
   *General*

WILLIAM C. PEACHEY
   *Director*

YAMILETH G. DAVILA
   *Assistant Director*

STEVEN A. PLATT
   *Senior Litigation Counsel*

  *s/ Ruth Ann Mueller*
RUTH ANN MUELLER
   *Trial Attorney*
   *Office of Immigration Litigation*
   *Civil Division*
   *U.S. Department of Justice*
   *P.O. Box 868, Ben Franklin Station*
   *Washington, DC 20044*
   *(202) 598-2445*
   *ruth.a.mueller@usdoj.gov*

SEAN L. KING
DAVID J. BYERLEY
   *Trial Attorneys*

57

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing motion complies with the requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font. I further certify that this motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 12,983 words according to the count of Microsoft Word, excluding the materials permitted to be excluded by Rule 32(f).

　s/ Ruth Ann Mueller
RUTH ANN MUELLER
*Trial Attorney*

## CERTIFICATE OF SERVICE

I hereby certify that on May 24, 2023, I electronically filed the foregoing with the Clerk of the circuit court by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system. I further certify that I will cause eight paper copies of this brief to be filed with the Court within two business days.

 s/ Ruth Ann Mueller
Ruth Ann Mueller
*Trial Attorney*

59

**ADDENDUM**

# ADDENDUM CONTENTS

Afghan Allies Protection Act, Pub. L. No. 111-8, 123 Stat. 807 (2009), *codified as amended in* 8 U.S.C. § 1101 note ..........................................................................A2

Refugee Crisis in Iraq Act, Pub. L. No. 110-181, 122 Stat. 395 (2008), *codified as amended in* 8 U.S.C. § 1157 note …………………………………………………A17

A1

**Afghan Allies Protection Act, Pub. L. No. 111-8, 123 Stat. 807 (2009),** *codified as amended in* **8 U.S.C. § 1101 note**

Sec. 601.   Short title.

This Act [Pub. L. 111-8, Div. F, Title VI, § 601 et seq., March 11, 2009, 123 Stat. 807, which enacted this note] may be cited as the 'Afghan Allies Protection Act of 2009'.

Sec. 602.   Protection for Afghan allies.

(a) Appropriate committees of Congress defined.—In this section, the term 'appropriate committees of Congress' means—

    (1) the Committee on Armed Services, the Committee on Foreign Relations, and the Committee on the Judiciary of the Senate; and

    (2) the Committee on Armed Services, the Committee on Foreign Affairs, and the Committee on the Judiciary of the House of Representatives.

(b) Special immigrant status for certain Afghans.—

    (1) In general.—Subject to paragraph (3), the Secretary of Homeland Security, or, notwithstanding any other provision of law, the Secretary of State in consultation with the Secretary of Homeland Security, may provide an alien described in subparagraph (A), (B), or (C) of paragraph (2) with the status of a special immigrant under section 101(a)(27) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(27)), if the alien—

        (A) or an agent acting on behalf of the alien, submits a petition for classification under section 203(b)(4) of such Act (8 U.S.C. 1153(b)(4));

        (B) is otherwise eligible to receive an immigrant visa;

        (C) is otherwise admissible to the United States for permanent residence (excluding the grounds for inadmissibility specified in section 212(a)(4) of such Act (8 U.S.C. 1182(a)(4)); and

        (D) clears a background check and appropriate screening, as determined by the Secretary of Homeland Security.

A2

(2) Aliens described.—

    (A) Principal aliens.—An alien is described in this subparagraph if the alien—

        (i) is a citizen or national of Afghanistan;

        (ii) was or is employed in Afghanistan on or after October 7, 2001, for not less than 1 year—

            (I) by, or on behalf of, the United States Government; or

            (II) by the International Security Assistance Force (or any successor name for such Force) in a capacity that required the alien—

                (aa) while traveling off-base with United States military personnel stationed at the International Security Assistance Force (or any successor name for such Force), to serve as an interpreter or translator for such United States military personnel; or

                (bb) to perform activities for the United States military personnel stationed at International Security Assistance Force (or any successor name for such Force);

        (iii) provided faithful and valuable service to an entity or organization described in clause (ii), which is documented in a positive recommendation or evaluation, subject to subparagraph (D), from the employee's senior supervisor or the person currently occupying that position, or a more senior person, if the employee's senior supervisor has left the employer or has left Afghanistan; and

        (iv) has experienced or is experiencing an ongoing serious threat as a consequence of the alien's employment described in clause (ii).

(B) Spouse or child.—An alien is described in this subparagraph if the alien—

    (i) is the spouse or child of a principal alien described in subparagraph (A); and

    (ii) is accompanying or following to join the principal alien in the United States.

(C) Surviving spouse or child.—

    (I) In general [sic; probably should read '(i) In general'].—An alien is described in this subparagraph if the alien—

    (I) was the spouse or child of a principal alien described in subparagraph (A) who had submitted an application to the Chief of Mission pursuant to this section or section 1059 of the National Defense Authorization Act for Fiscal Year 2006 (Public Law 109-163; 8 U.S.C. 1101 note) which included the alien as an accompanying spouse or child; and

    (II) due to the death of the principal alien—

        (aa) such petition was revoked or terminated (or otherwise rendered null); and

        (bb) such petition would have been approved if the principal alien had survived.

    (II) Employment requirements [sic; probably should read '(ii) Employment requirements'].—An application by a surviving spouse or child of a principal alien shall be subject to employment requirements set forth in subparagraph (A) as of the date of the principal alien's filing of an application for the first time, or if no application has been filed, the employment requirements as of the date of the principal alien's death.

(D) Approval by Chief of Mission required.—

(i) In general.—Except as provided under clause (ii), a recommendation or evaluation required under subparagraph (A)(iii) shall be accompanied by approval from the appropriate Chief of Mission, or the designee of the appropriate Chief of Mission, who shall conduct a risk assessment of the alien and an independent review of records maintained by the United States Government or hiring organization or entity to confirm employment and faithful and valuable service to the United States Government prior to approval of a petition under this section.

(ii) Review process for denial by Chief of Mission.—

(I) In general.—An applicant who has been denied Chief of Mission approval shall—

(aa) receive a written decision that provides, to the maximum extent feasible, information describing the basis for the denial, including the facts and inferences underlying the individual determination; and

(bb) be provided not more than one written appeal per denial or revocation—

(AA) that shall be submitted not more than 120 days after the date that the applicant receives such decision in writing or thereafter at the discretion of the Secretary of State; and

(BB) that may request reopening of such decision and provide additional information, clarify existing information, or explain any unfavorable information.

A5

(II) Afghan Special Immigrant Visa Coordinator.— The Secretary of State shall designate, in the Embassy of the United States in Kabul, Afghanistan, an Afghan Special Immigrant Visa Coordinator responsible for overseeing the efficiency and integrity of the processing of special immigrant visas under this section, who shall be given—

> (aa) sufficiently high security clearance to review information supporting Chief of Mission denials if an appeal of a denial is filed;

> (bb) responsibility for ensuring that an applicant described in subclause (I) receives the information described in subclause (I)(aa); and

> (cc) responsibility for ensuring that every applicant is provided a reasonable opportunity to provide additional information, clarify existing information, or explain any unfavorable information pursuant to [sub]clause (I)(bb).

(E) Evidence of serious threat.—A credible sworn statement depicting dangerous country conditions, together with official evidence of such country conditions from the United States Government, should be considered as a factor in determination of whether the alien has experienced or is experiencing an ongoing serious threat as a consequence of the alien's employment by the United States Government for purposes of subparagraph (A)(iv).

(F) Representation.—An alien applying for admission to the United States pursuant to this title may be represented during the application process, including at relevant interviews and examinations, by an attorney or other accredited representative.   Such representation shall not be at the expense of the United States Government.

A6

(3) Numerical limitations.—

  (A) In general.—Except as provided in subparagraph (C), the total number of principal aliens who may be provided special immigrant status under this section may not exceed 1,500 per year for each of the fiscal years 2009, 2010, 2011, 2012, and 2013.

  (B) Exclusion from numerical limitations.—Aliens provided special immigrant status under this subsection shall not be counted against any numerical limitation under sections 201(d), 202(a), or 203(b)(4) of the Immigration and Nationality Act ( 8 U.S.C. 1151(d), 1152(a), and 1153(b)(4)).

  (C) Carry forward.—

    (i) Fiscal years 2009 through 2013.—If the numerical limitation specified in subparagraph (A) is not reached during a given fiscal year, with respect to fiscal year 2009, 2010, 2011, 2012, or 2013, the numerical limitation specified in such subparagraph for the following fiscal year shall be increased by a number equal to the difference between—

      (I) the numerical limitation specified in subparagraph (A) for the given fiscal year; and

      (II) the number of principal aliens provided special immigrant status under this section during the given fiscal year.

    (ii) Fiscal year 2014.—If the numerical limitation determined under clause (i) is not reached in fiscal year 2013, the total number of principal aliens who may be provided special immigrant status under this subsection for fiscal year 2014 shall be equal to the difference between—

      (I) the numerical limitation determined under clause (i) for fiscal year 2013; and

      (II) the number of principal aliens provided such status under this section during fiscal year 2013.

A7

(D) Additional fiscal year.—For fiscal year 2014, the total number of principal aliens who may be provided special immigrant status under this section may not exceed 3,000, except that any unused balance of the total number of principal aliens who may be provided special immigrant status in fiscal year 2014 may be carried forward and provided through the end of fiscal year 2015, notwithstanding the provisions of paragraph (C), except that the one year period during which an alien must have been employed in accordance with subsection (b)(2)(A)(ii) shall be the period from October 7, 2001 through December 31, 2014, and except that the principal alien seeking special immigrant status under this subparagraph shall apply to the Chief of Mission in accordance with subsection (b)(2)(D) no later than September 30, 2014.

(E) Special rule for end of calendar year 2014.—

  (i) In general.—During the period beginning on the date of the enactment of this subparagraph [Aug. 8, 2014] and ending on December 31, 2014, an additional 1,000 principal aliens may be provided special immigrant status under this section. For purposes of status provided under this subparagraph—

    (I) the period during which an alien must have been employed in accordance with paragraph (2)(A)(ii) must terminate on or before December 31, 2014;

    (II) the principal alien seeking special immigrant status under this subparagraph shall apply to the Chief of Mission in accordance with paragraph (2)(D) not later than December 31, 2014; and

    (III) the authority to provide such status shall terminate on December 31, 2014.

  (ii) Construction.—Clause (i) shall not be construed to affect the authority, numerical limitations, or terms for provision of status, under subparagraph (D).

A8

(F) Fiscal years 2015 through 2023.—In addition to any unused balance under subparagraph (D), for the period beginning on the date of the enactment of this subparagraph [Dec. 19, 2014] until such time that available special immigrant visas under subparagraphs (D) and (E) and this subparagraph are exhausted, the total number of principal aliens who may be provided special immigrant status under this section shall not exceed 38,500. For purposes of status provided under this subparagraph—

(i) the period during which an alien must have been employed in accordance with paragraph (2)(A)(ii) must terminate on or before December 31, 2024;; [sic]

(ii) the principal alien seeking special immigrant status under this subparagraph shall apply to the Chief of Mission in accordance with paragraph (2)(D) not later than December 31, 2024;; [sic] and

(iii) the authority to issue visas shall commence on the date of the enactment of this subparagraph [Dec. 19, 2014] and shall terminate on the date such visas are exhausted.

(4) Application process.—

(A) In general.—Not later than 120 days after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2014 [Dec. 26, 2013], the Secretary of State and the Secretary of Homeland Security, in consultation with the Secretary of Defense, shall improve the efficiency by which applications for special immigrant visas under paragraph (1), are processed so that all steps, including Chief of Mission approval, under the control of the respective departments incidental to the issuance of such visas, including required screenings and background checks, should be completed not later than 9 months after the date on which an eligible alien submits all required materials to complete an application for such visa.

(B) Construction.—Nothing in this section shall be construed to limit the ability of a Secretary referred to in subparagraph (A)

to take longer than 9 months to complete those steps incidental to the issuance of such visas in high-risk cases for which satisfaction of national security concerns requires additional time.

(C) Prohibition on fees.—The Secretary of Homeland Security or the Secretary of State may not charge an alien described in subparagraph (A), (B), or (C) of paragraph (2) any fee in connection with an application for, or issuance of, a special immigrant visa under this section.

(5) Assistance with passport issuance.—The Secretary of State shall make a reasonable effort to ensure that an alien described in subparagraph (A), (B), or (C) of paragraph (2) who is issued a special immigrant visa pursuant to this subsection is provided with the appropriate series Afghan passport necessary to enter the United States.

(6) Protection of aliens.—The Secretary of State, in consultation with the heads of other appropriate Federal agencies, shall make a reasonable effort to provide an alien described in subparagraph (A), (B), or (C) of paragraph (2) who is seeking special immigrant status under this subsection protection or to immediately remove such alien from Afghanistan, if possible, if the Secretary determines, after consultation, that such alien is in imminent danger.

(7) Other eligibility for immigrant status.—No alien shall be denied the opportunity to apply for admission under this subsection solely because such alien qualifies as an immediate relative or is eligible for any other immigrant classification.

(8) Resettlement support.—A citizen or national of Afghanistan who is granted special immigrant status described in section 101(a)(27) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(27)) shall be eligible for resettlement assistance, entitlement programs, and other benefits available to refugees admitted under section 207 of such Act (8 U.S.C. 1157) to the same extent, and for the same periods of time, as such refugees.

(9) Adjustment of status.—Notwithstanding paragraph (2), (7), or (8) of subsection (c) of section 245 of the Immigration and Nationality Act (8 U.S.C. 1255), the Secretary of Homeland Security may adjust the

A10

status of an alien described in subparagraph (A), (B), or (C) of paragraph (2) of this subsection or in section 1244(b) of the Refugee Crisis in Iraq Act of 2007 (Public Law 110-181 ; 122 Stat. 397) [ Pub.L. 110-181, Div. A, Title XII, § 1244(b), Jan. 28, 2008, 122 Stat. 397, which is set out in a note under 8 U.S.C.A. § 1157] to that of an alien lawfully admitted for permanent residence under subsection (a) of such section 245 [ 8 U.S.C.A. § 1255(a)] if the alien—

> (A) was paroled or admitted as a nonimmigrant into the United States; and

> (B) is otherwise eligible for special immigrant status under—

>> (i)

>>> (I) this subsection; or

>>> (II) such section 1244(b) [section 1244(b) of Pub.L. 110-181, Div. A, Title XII, Jan. 28, 2008, 122 Stat. 397, which is set out in a note under 8 U.S.C.A. § 1157]; and

>> (ii) the Immigration and Nationality Act ( 8 U.S.C. 1101 et seq. ) [Act June 27, 1952, c. 477, 66 Stat. 163, as amended, which is principally classified to this chapter].

(10) Annual report on use of special immigrant status.—

> (A) Requirement.—Not later than 120 days after the date of the enactment of this Act [March 11, 2009], and annually thereafter, the Secretary of Homeland Security shall submit to the appropriate committees of Congress a report on the number of citizens or nationals of Afghanistan or Iraq who have applied for status as special immigrants under this subsection or section 1244 of the Refugee Crisis in Iraq Act of 2007 (Public Law 110-181; 122 Stat. 396) [Pub. L. 110-181, Div. A, Title XII, § 1244, Jan. 28, 2008, 122 Stat. 396, which is set out in a note under 8 U.S.C.A. § 1157].

> (B) Content.—Each report required by subparagraph (A) submitted in a fiscal year shall include the following information for the previous fiscal year:

A11

(i) The number of citizens or nationals of Afghanistan or Iraq who submitted an application for status as a special immigrant pursuant to this section or section 1244 of the Refugee Crisis in Iraq Act of 2007 (Public Law 110-181; 122 Stat. 396) [Pub.L. 110-181, Div. A, Title XII, §1244, Jan. 28, 2008, 122 Stat. 396, which is set out in a note under 8 U.S.C.A. § 1157 ], disaggregated—

(I) by the number of principal aliens applying for such status; and

(II) by the number of spouses and children of principal aliens applying for such status.

(ii) The number of applications referred to in clause (i) that—

(I) were approved; or

(II) were denied, including a description of the basis for each denial.

(11) Report on improvements.—

(A) Requirement for report.—Not later than 120 days after the date of the enactment of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 [Aug. 13, 2018], the Secretary of State and the Secretary of Homeland Security, in consultation with the Secretary of Defense, shall submit to the appropriate committees of Congress a report, with a classified annex, if necessary.

(B) Contents.—The report required by subparagraph (A) shall describe the implementation of improvements to the processing of applications for special immigrant visas under this subsection, including information relating to—

(i) Enhancing existing systems for conducting background and security checks of persons applying for special immigrant status, which shall—

(I) support immigration security; and

A12

(II) provide for the orderly processing of such
applications without significant delay;

(ii) the financial, security, and personnel considerations and
resources necessary to carry out this section;

(iii) the number of aliens who have applied for special
immigrant visas under this subsection during each month
of the preceding fiscal year;

(iv) the reasons for the failure to process any applications
that have been pending for longer than 9 months;

(v) The total number of applications that are pending due to
the failure—

(I) to receive approval from the Chief of Mission;

(II) of U.S. Citizenship and Immigration Services to
complete the adjudication of the Form I-360;

(III) to conduct a visa interview; or

(IV) to issue the visa to an eligible alien;

(vi) the average wait times for an applicant at each of the
stages described in clause (v);

(vii) the number of denials or rejections at each of the stages
described in clause (v); and

(viii) the reasons for denials by the Chief of Mission based
on the categories already made available to denied
special immigrant visa applicants in the denial letter sent
to them by the Chief of Mission.

(12) Public quarterly reports.—Not later than 120 days after the date of
the enactment of the National Defense Authorization Act for Fiscal
Year 2014 [Dec. 26, 2013], and every 3 months thereafter, the
Secretary of State and the Secretary of Homeland Security, in
consultation with the Secretary of Defense, shall publish a report on
the website of the Department of State that describes the efficiency
improvements made in the process by which applications for special

A13

immigrant visas under this subsection are processed, including information described in clauses (iii) through (viii) of paragraph (11)(B).

(13) Report.—Not later than December 31, 2016, and annually thereafter through January 31, 2024, the Secretary of State and the Secretary of Homeland Security, in consultation with the Secretary of Defense, shall submit a report to the appropriate committees of Congress containing the following information:

> (A) The occupations of aliens who—
>
> > (i) were provided special immigrant status under subclause (I) or (II)(bb) of paragraph (2)(A)(ii); and
> >
> > (ii) were considered principal aliens for such purpose.
>
> (B) The number of appeals submitted under paragraph (2)(D)(ii)(I)(bb) from application denials by the Chief of Mission and the number of those applications that were approved pursuant to the appeal.
>
> (C) The number of applications denied by the Chief of Mission on the basis of derogatory information that were appealed and the number of those applications that were approved pursuant to the appeal.
>
> (D) The number of applications denied by the Chief of Mission on the basis that the applicant did not establish faithful and valuable service to the United States Government that were appealed and the number of those applications that were approved pursuant to the appeal.
>
> (E) The number of applications denied by the Chief of Mission for failure to establish the one-year period of employment required that were appealed and the number of those applications that were approved pursuant to the appeal.
>
> (F) The number of applications denied by the Chief of Mission for failure to establish employment by or on behalf of the United States Government that were appealed and the number

A14

of those applications that were approved pursuant to the appeal.

(G) The number of special immigrant status approvals revoked by the Chief of Mission and the reason for each revocation.

(H) The number of special immigrant status approvals revoked by the Chief of Mission that were appealed and the number of those revocations that were overturned pursuant to the appeal.

(14) Reports informing the conclusion of the Afghan Special Immigrant VISA Program.—Not later than June 1, 2016, and every six months thereafter, the Secretary of Defense, in conjunction with the Secretary of State, shall submit to the Committee on Armed Services and the Committee on the Judiciary of the Senate and the Committee on Armed Services and the Committee on the Judiciary of the House of Representatives a report that contains—

(A) a description of the United States force presence in Afghanistan during the previous 6 months;

(B) a description of the projected United States force presence in Afghanistan;

(C) the number of citizens or nationals of Afghanistan who were employed by or on behalf of the entities described in paragraph (2)(A)(ii) during the previous 6 months; and

(D) the projected number of such citizens or nationals who will be employed by or on behalf of such entities.

(15) Sense of Congress.—It is the sense of Congress that the necessity of providing special immigrant status under this subsection should be assessed at regular intervals by the Committee on Armed Services of the Senate and the Committee on Armed Services of the House of Representatives, taking into account the scope of the current and planned presence of United States troops in Afghanistan, the current and prospective numbers of citizens and nationals of Afghanistan employed by or on behalf of the entities described in paragraph (2)(A)(ii), and the security climate in Afghanistan. [(16) Redesignated (15)]

A15

(c) Rule of construction.—Nothing in this section may be construed to affect the authority of the Secretary of Homeland Security under section 1059 of the National Defense Authorization Act for Fiscal Year 2006 (Public Law 109-163; 8 U.S.C. 1101 note). [(d)  Redesignated (c)]

**Refugee Crisis in Iraq Act, Pub. L. No. 110-181, 122 Stat. 395 (2008),** *codified as amended in* **8 U.S.C. § 1157 note**

Sec. 1241.    Short title.

This subtitle [this note] may be cited as the 'Refugee Crisis in Iraq Act of 2007'.

Sec. 1242.    Processing mechanisms.

(a) In general.—The Secretary of State, in consultation with the Secretary of Homeland Security, shall establish or use existing refugee processing mechanisms in Iraq and in countries, where appropriate, in the region in which—

   (1) aliens described in section 1243 [of this note] may apply and interview for admission to the United States as refugees; and

   (2) aliens described in section 1244(b) [of this note] may apply and interview for admission to United States as special immigrants.

(b) Suspension.—If such is determined necessary, the Secretary of State, in consultation with the Secretary of Homeland Security, may suspend in-country processing under subsection (a) for a period not to exceed 90 days. Such suspension may be extended by the Secretary of State upon notification to the Committee on the Judiciary of the House of Representatives, the Committee on Foreign Affairs of the House of Representatives, the Committee on the Judiciary of the Senate, and the Committee on Foreign Relations of the Senate. The Secretary of State shall submit to such committees a report outlining the basis of any such suspension and any extensions thereof.

(c) Improved application process.—

   (1) In general.—Not later than 120 days after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2014 [Dec. 26, 2013], the Secretary of State and the Secretary of Homeland Security, in consultation with the Secretary of Defense, shall improve the efficiency by which applications for special immigrant visas under section 1244(a) [of this note], are processed so that all steps under the control of the respective departments incidental to the issuance of such visas, including required screenings and background checks,

A17

should be completed not later than 9 months after the date on which an eligible alien submits all required materials to complete an application for such visa.

(2) Construction.—Nothing in this section shall be construed to limit the ability of a Secretary referred to in paragraph (1) to take longer than 9 months to complete those steps incidental to the issuance of such visas in high-risk cases for which satisfaction of national security concerns requires additional time.

(d) Representation.—An alien applying for admission to the United States pursuant to this subtitle [this note] may be represented during the application process, including at relevant interviews and examinations, by an attorney or other accredited representative. Such representation shall not be at the expense of the United States Government.

Sec. 1243.    United States refugee program processing priorities.

(a) In general.—Refugees of special humanitarian concern eligible for Priority 2 processing under the refugee resettlement priority system who may apply directly to the United States Admission Program shall include—

(1) Iraqis who were or are employed by the United States Government, in Iraq;

(2) Iraqis who establish to the satisfaction of the Secretary of State that they are or were employed in Iraq by—

(A) a media or nongovernmental organization headquartered in the United States; or

(B) an organization or entity closely associated with the United States mission in Iraq that has received United States Government funding through an official and documented contract, award, grant, or cooperative agreement; and

(3) spouses, children, and parents whether or not accompanying or following to join, and sons, daughters, and siblings of aliens described in paragraph (1), paragraph (2), or section 1244(b)(1) [of this note]; and

A18

    (4) Iraqis who are members of a religious or minority community, have been identified by the Secretary of State, or the designee of the Secretary, as a persecuted group, and have close family members (as described in section 201(b)(2)(A)(i) or 203(a) of the Immigration and Nationality Act (8 U.S.C. 1151(b)(2)(A)(i) and 1153(a))) in the United States.

(b) Identification of other persecuted groups.—The Secretary of State, or the designee of the Secretary, is authorized to identify other Priority 2 groups of Iraqis, including vulnerable populations.

(c) Ineligible organizations and entities.—Organizations and entities described in subsection (a)(2) shall not include any that appear on the Department of the Treasury's list of Specially Designated Nationals or any entity specifically excluded by the Secretary of Homeland Security, after consultation with the Secretary of State and the heads of relevant elements of the intelligence community (as defined in section 3(4) of the National Security Act of 1947 (50 U.S.C. 401a(4)) [now 50 U.S.C.A. § 3003(4)]).

(d) Applicability of other requirements.—Aliens under this section who qualify for Priority 2 processing under the refugee resettlement priority system shall satisfy the requirements of section 207 of the Immigration and Nationality Act ( 8 U.S.C. 1157 ) [this section] for admission to the United States.

(e) Numerical limitations.—In determining the number of Iraqi refugees who should be resettled in the United States under paragraphs (2), (3), and (4) of subsection (a) and subsection (b) of section 207 of the Immigration and Nationality Act (8 U.S.C. 1157), the President shall consult with the heads of nongovernmental organizations that have a presence in Iraq or experience in assessing the problems faced by Iraqi refugees.

(f) Eligibility for admission as refugee.—No alien shall be denied the opportunity to apply for admission under this section solely because such alien qualifies as an immediate relative or is eligible for any other immigrant classification.

Sec. 1244.    Special immigrant status for certain Iraqis.

(a) In general.—Subject to subsection (c), the Secretary of Homeland Security, or, notwithstanding any other provision of law, the Secretary of State in consultation with the Secretary of Homeland Security, may provide an alien

A19

described in subsection (b) with the status of a special immigrant under section 101(a)(27) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(27) ), if the alien—

(1) or an agent acting on behalf of the alien, submits a petition for classification under section 203(b)(4) of such Act (8 U.S.C. 1153(b)(4));

(2) is otherwise eligible to receive an immigrant visa;

(3) is otherwise admissible to the United States for permanent residence (excluding the grounds for inadmissibility specified in section 212(a)(4) of such Act (8 U.S.C. 1182(a)(4))); and

(4) cleared a background check and appropriate screening, as determined by the Secretary of Homeland Security.

(b) Aliens described.—

(1) Principal aliens.—An alien is described in this subsection if the alien—

(A) is a citizen or national of Iraq;

(B) was or is employed by or on behalf of the United States Government in Iraq, on or after March 20, 2003, for not less than one year;

(C) provided faithful and valuable service to the United States Government, which is documented in a positive recommendation or evaluation, subject to paragraph (4), from the employee's senior supervisor or the person currently occupying that position, or a more senior person, if the employee's senior supervisor has left the employer or has left Iraq; and

(D) has experienced or is experiencing an ongoing serious threat as a consequence of the alien's employment by the United States Government.

(2) Spouses and children.—An alien is described in this subsection if the alien—

(A) is the spouse or child of a principal alien described in paragraph (1); and

(B) is accompanying or following to join the principal alien in the United States.

(3) Treatment of surviving spouse or child.—

(A) In general.—An alien is described in this subsection if the alien—

(i) was the spouse or child of a principal alien described in paragraph (1) who submitted an application to the Chief of Mission pursuant to this section or section 1059 of the National Defense Authorization Act for Fiscal Year 2006 (Public Law 109-163 ; 8 U.S.C. 1101 note), which included the alien as an accompanying spouse or child; and

(ii) due to the death of the principal alien—

(I) such petition was revoked or terminated (or otherwise rendered null); and

(II) such petition would have been approved if the principal alien had survived.

(B) Employment requirements.—An application by a surviving spouse or child of a principal alien shall be subject to employment requirements set forth in paragraph (1) as of the date of the principal alien's filing of an application for the first time, or if the principal alien did not file an application, the employment requirements as of the date of the principal alien's death.

(4) Approval by Chief of Mission required.—

(A) In general.—Except as provided under subparagraph (B), a recommendation or evaluation required under paragraph (1)(C) shall be accompanied by approval from the Chief of Mission, or the designee of the Chief of Mission, who shall conduct a risk assessment of the alien and an independent

A21

review of records maintained by the United States Government or hiring organization or entity to confirm employment and faithful and valuable service to the United States Government prior to approval of a petition under this section.

(B) Review process for denial by Chief of Mission.—

    (i) In general.—An applicant who has been denied Chief of Mission approval required by subparagraph (A) shall—

        (I) receive a written decision that provides, to the maximum extent feasible, information describing the basis for the denial, including the facts and inferences underlying the individual determination; and

        (II) be provided not more than one written appeal—

            (aa) that shall be submitted not more than 120 days after the date that the applicant receives such decision in writing; and

            (bb) that may request reopening of such decision and provide additional information, clarify existing information, or explain any unfavorable information.

    (ii) Iraqi Special Immigrant Visa Coordinator.—The Secretary of State shall designate, in the Embassy of the United States in Baghdad, Iraq, an Iraqi Special Immigrant Visa Coordinator responsible for overseeing the efficiency and integrity of the processing of special immigrant visas under this section, who shall be given—

        (I) sufficiently high security clearance to review information supporting Chief of Mission denials if an appeal of a denial is filed;

        (II) responsibility for ensuring that an applicant described in clause (i) receives the information described in clause (i)(I); and

A22

(III) responsibility for ensuring that every applicant is provided a reasonable opportunity to provide additional information, clarify existing information, or explain any unfavorable information pursuant to clause (i)(II).

(5) Evidence of serious threat.—A credible sworn statement depicting dangerous country conditions, together with official evidence of such country conditions from the United States Government, should be considered as a factor in determination of whether the alien has experienced or is experiencing an ongoing serious threat as a consequence of the alien's employment by the United States Government for purposes of paragraph (1)(D).

(c) Numerical limitations.—

(1) In general.—The total number of principal aliens who may be provided special immigrant status under this section may not exceed 5,000 per year for fiscal years 2008 through 2012.

(2) Exclusion from numerical limitations.—Aliens provided special immigrant status under this section shall not be counted against any numerical limitation under sections 201(d), 202(a), or 203(b)(4) of the Immigration and Nationality Act (8 U.S.C. 1151(d), 1152(a), and 1153(b)(4)).

(3) Carry forward.—

(A) Fiscal years 2008 through 2011.—If the numerical limitation specified in paragraph (1) is not reached during a given fiscal year referred to in such paragraph (with respect to fiscal years 2008 through 2011), the numerical limitation specified in such paragraph for the following fiscal year shall be increased by a number equal to the difference between—

(i) the numerical limitation specified in paragraph (1) for the given fiscal year; and

(ii) the number of principal aliens provided special immigrant status under this section during the given fiscal year.

A23

(B) Fiscal years 2012 and 2013.—If the numerical limitation specified in paragraph (1) is not reached in fiscal year 2012, the total number of principal aliens who may be provided special immigrant status under this section for fiscal year 2013 shall be equal to the difference between—

   (i) the numerical limitation specified in paragraph (1) for fiscal year 2012; and

   (ii) the number of principal aliens provided such status under this section during fiscal year 2012.

(C) Limitation on number of visas.—

   (i) In general.—The total number of principal aliens who may be provided special immigrant status under this section after January 1, 2014, shall be not more than 2500.

   (ii) Employment period.—The 1-year period during which the principal alien is required to have been employed by or on behalf of the United States Government in Iraq under subsection (b)(1)(B) shall begin on or after March 20, 2003, and end on or before September 30, 2013.

   (iii) Application deadline.—The principal alien seeking special immigrant status under this subparagraph shall apply to the Chief of Mission in accordance with subsection (b)(4) not later than September 30, 2014.

(d) Visa and passport issuance and fees.—Neither the Secretary of State nor the Secretary of Homeland Security may charge an alien described in subsection (b) any fee in connection with an application for, or issuance of, a special immigrant visa. The Secretary of State shall make a reasonable effort to ensure that aliens described in this section who are issued special immigrant visas are provided with the appropriate series Iraqi passport necessary to enter the United States.

(e) Protection of aliens.—The Secretary of State, in consultation with the heads of other relevant Federal agencies, shall make a reasonable effort to provide an alien described in this section who is applying for a special immigrant visa with protection or the immediate removal from Iraq, if possible, of such

A24

alien if the Secretary determines after consultation that such alien is in imminent danger.

(f) Eligibility for admission under other classification.—No alien shall be denied the opportunity to apply for admission under this section solely because such alien qualifies as an immediate relative or is eligible for any other immigrant classification.

(g) Resettlement support.—Iraqi aliens granted special immigrant status described in section 101(a)(27) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(27)) shall be eligible for resettlement assistance, entitlement programs, and other benefits available to refugees admitted under section 207 of such Act (8 U.S.C. 1157) [this section] to the same extent, and for the same periods of time, as such refugees.

(h) Rule of construction.—Nothing in this section may be construed to affect the authority of the Secretary of Homeland Security under section 1059 of the National Defense Authorization Act for Fiscal Year 2006 [8 U.S.C.A. § 1101 note].

Sec. 1245.    Senior Coordinator for Iraqi Refugees and Internally Displaced Persons.

(a) Designation in Iraq.—The Secretary of State shall designate in the embassy of the United States in Baghdad, Iraq, a Senior Coordinator for Iraqi Refugees and Internally Displaced Persons (referred to in this section as the 'Senior Coordinator').

(b) Responsibilities.—The Senior Coordinator shall be responsible for the oversight of processing for the resettlement in the United States of refugees of special humanitarian concern, special immigrant visa programs in Iraq, and the development and implementation of other appropriate policies and programs concerning Iraqi refugees and internally displaced persons.   The Senior Coordinator shall have the authority to refer persons to the United States refugee resettlement program.

(c) Designation of additional Senior Coordinators.—The Secretary of State shall designate in the embassies of the United States in Cairo, Egypt, Amman, Jordan, Damascus, Syria, and Beirut, Lebanon, a Senior Coordinator to oversee resettlement in the United States of refugees of special humanitarian concern in those countries to ensure their applications to the United States

A25

refugee resettlement program are processed in an orderly manner and without delay.